763 So.2d 659 (1999)
Mandy L. McNEELY and Patsy Brewer
v.
FORD MOTOR COMPANY, INC., Bayshore Motors Ford, Inc., Town and Country Ford, Inc., Dan Quirk Ford, Inc., Pete Avington Ford, and ABC, DEF, GHI, JKL, XYZ Insurance Companies.
No. 98 CA 2139.
Court of Appeal of Louisiana, First Circuit.
December 28, 1999.
Writ Denied April 28, 2000.
*660 Arthur O'Keefe, Davy P. Laborde, New Orleans, for Plaintiffs-Appellants Patsy M. Brewer and Douglas McNeely.
Michael T. Pulaski, Keith McDaniel, New Orleans, for Defendant-Appellee Ford Motor Co., Inc.
Before: CARTER, C.J., LeBLANC, and PETTIGREW, JJ.
*661 PETTIGREW, J.
In this suit concerning the sale of an allegedly defective vehicle, plaintiff appeals a judgment in favor of the automobile manufacturer. For the reasons that follow, we reverse in part, render, and remand to the trial court for further proceedings.

FACTS AND PROCEDURAL HISTORY
The facts leading up to the instant suit for damages were basically uncontested by the parties. According to the record, on July 5, 1989, the family of Mandy L. McNeely purchased a new 1989 Mercury Topaz from Bayshore Motors Ford-Lincoln-Mercury in Houston, Texas, for Ms. McNeely. The vehicle was manufactured by Ford Motor Company. On February 2, 1990, while Ms. McNeely was travelling to Alexandria, Louisiana, the vehicle threw a piston rod that cracked its engine block, causing Ms. McNeely to "swerve off the highway, run through a guard rail and into a ditch." The vehicle was towed to Town & Country Ford in Denham Springs, Louisiana, for repairs, including the replacement of the vehicle's "short block" (the lower half of the engine.) Repair records from Town & Country Ford indicate that the vehicle had approximately 3,800 miles on it at the time of the repairs, and all of the work was done under warranty. According to Ms. McNeely, the vehicle was at Town & Country Ford for about three or four weeks for these repairs.[1]
Subsequently on March 19, 1990, Ms. McNeely brought the vehicle to Dan Quirk Ford in Slidell, Louisiana, complaining of alignment problems and a "popping" noise in the front end. The vehicle had approximately 4,000 miles on the odometer, and again, the repairs were done under warranty. There is no indication in the record as to how long the vehicle remained at Dan Quirk Ford for these repairs.
The next incident involving the vehicle occurred on September 1, 1990, when Ms. McNeely and her daughter, Patsy Brewer, were leaving a local beauty salon. When Ms. Brewer turned the ignition key to start the vehicle, she heard a loud noise that sounded like a nearby vehicle backfiring. Ms. McNeely, who was seated in the passenger seat at the time, attempted to exit the vehicle in a panic and became entangled in the automatic seatbelt. Ms. Brewer described her mother as "hanging in the air" and indicated that she "looked real funny." Ms. Brewer was not frightened by the incident, and in fact, laughed about it until she realized that her mother was hurt. According to Ms. Brewer, the car was not on fire, but steam was coming from under the hood.
Three days later, on September 4, 1990, the vehicle was returned to Dan Quirk Ford for repair. The repair record from this date reveals that the vehicle had approximately 8,000 miles on the odometer. Again, the "short block" of the engine was replaced under warranty. Both Ms. McNeely and Ms. Brewer indicated that the vehicle remained at Dan Quirk Ford for over one month for these repairs.
Ms. McNeely testified that the vehicle ran "pretty good" for a while after that, but was later brought into Pete Abbington Ford in Alexandria, Louisiana, to have the radiator replaced. According to Ms. McNeely, she drove the vehicle until it had approximately 19,600 miles on it, at which time she parked the car and purchased another vehicle. She indicated that she became too frightened to drive the vehicle. Ms. Brewer indicated that they applied for mediation to receive either a refund of the sales price or a replacement vehicle. However, no evidence was introduced regarding the outcome of this mediation.
*662 On August 29, 1991, Ms. McNeely and Ms. Brewer filed the instant suit in redhibition and for personal injuries. Named as defendants in the original petition were Bayshore Motors Ford-Lincoln-Mercury, Town & Country Ford, Dan Quirk Ford-Lincoln-Mercury, Pete Abbington Ford, and Ford Motor Company ("Ford").[2] After Ms. McNeely's death in 1997, Ms. Brewer amended her petition to add claims for a survival action and wrongful death damages and to include her brother, Joe D. McNeely, as an additional plaintiff.
The matter proceeded to jury trial on December 8, 9, 10 and 11, 1997. At the close of plaintiffs' case, Ford moved for a directed verdict as to several claims made by the plaintiffs. The following colloquy occurred between the trial court and trial counsel regarding the court's rulings on Ford's motions:
BY THE COURT:
All right. On defendant's motion to dismiss under the [Louisiana Products Liability Act ("LPLA"),] I grant [the motion] as to the first three elements of recovery. Deny [the motion] as to nonconformity with the express warranty.
I also dismiss plaintiff Joe McNeely on the wrongful death claim and maintain his survival claim. So that would apply to the wrongful death [claim] filed by Patsy Brewer and remaining survival claim of Joe McNeely.
The actions under the [LPLA], deny your motion on the redhibition claim to dismiss. And I think that addresses all your motions; is that correct?
BY MR. HEBERT:
Just to be sure that I'm clear, the only theory left under the [LPLA] is nonconformity to express warranty?
BY THE COURT:
That's correct.
BY MR. HEBERT:
And the wrongful death [claim] is gone?
BY THE COURT:
The wrongful death [claim] of Joe McNeely is gone.
BY MR. HEBERT:
But it's still here for Patsy?
BY THE COURT:
That's correct.
BY MR. HEBERT:
But Mr. McNeely's survival action maintains?
BY THE COURT:
That's correct.
BY MR. HEBERT:
And redhibition, I'm sorry. I didn't hear if you made separate rulings as to
BY THE COURT:
I'm denying your motion to dismiss with regard to the redhibition claim.
BY MR. HEBERT:
Both on rescission and reduction in price?
BY THE COURT:
That's correct.
The remaining claims went to the jury for consideration. After deliberation, the jury returned a verdict in favor of Ford. The jury determined that the vehicle was not unreasonably dangerous because it failed to comply with an express warranty made by Ford. Further, although the jury determined that the vehicle contained redhibitory defects that rendered the vehicle absolutely useless for its intended purpose, the jury found that the redhibitory defects did not exist at the time the vehicle left the custody and control of Ford. The jury concluded that Ms. McNeely was not entitled *663 to rescission of the sale of the vehicle and had not suffered any damages as a result of the redhibitory defects in the vehicle. On December 18, 1997, the trial court rendered judgment in accordance with the jury's verdict dismissing the plaintiffs' suit in its entirety with prejudice.
Subsequently, the plaintiffs filed a motion for judgment notwithstanding the verdict and/or a new trial with respect to the jury's verdict. The motion was scheduled for hearing, and on March 17, 1998, the trial court ruled as follows:
Having considered the briefs of the parties, argument of counsel and the evidence presented at trial, this Court is not convinced that the evidence points so strongly and overwhelmingly in favor of plaintiffs that reasonable men could not have arrived at a contrary verdict, given the facts at trial. Accordingly, plaintiffs' Motion for Judgment Notwithstanding the Verdict is denied. Further, plaintiffs' Motion for New Trial is denied because the Court is convinced that the verdict is supportable by a fair interpretation of the evidence presented at trial.
Because plaintiffs have failed to demonstrate the required showing for the granting of a Judgment Notwithstanding the Verdict or a Motion for New Trial, both motions are denied.,
The plaintiffs have appealed these judgments, assigning the following specifications of error:
1. The trial court erred by applying the wrong standard in summarily dismissing plaintiffs cause of action under Louisiana's "Lemon Law".
2. The jury was clearly and manifestly wrong in rendering its verdict denying plaintiffs redhibition claim.
3. The trial court erred by applying the wrong standard in granting defendant's directed verdict dismissing plaintiffs' claim for defective "construction and composition" under the Louisiana Products Liability Act.
4. The jury was clearly and manifestly wrong in rendering its verdict denying plaintiff's claim under the "express warranty" provision of the Louisiana Products Liability Act.
5. The jury was clearly and manifestly wrong in failing to consider Patsy Brewer's claim for "Lejuene" damages under La.C.C. Art. 2315.6.
6. The trial court erred by failing to grant plaintiffs' JNOV seeking to overturn the jury verdict and award plaintiffs damages, costs and attorney fees.

LOUISIANA PRODUCTS LIABILITY ACT

(Assignments of Error Numbers Three and Four)
A manufacturer's responsibility for an unreasonably dangerous product is set forth in La. R.S. 9:2800.54 as follows:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous *664 under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
As previously indicated, the trial court granted a directed verdict as to the first three theories of recovery provided for under the LPLA. However, the remaining claim under the LPLA, that the vehicle was unreasonably dangerous because it did not conform to an express warranty, went to the jury for consideration.
In their third assignment of error, plaintiffs assert that the trial court erred in granting a directed verdict as to their claim that the vehicle was unreasonably dangerous in construction or composition. Further, in assignment of error number four, plaintiffs contend that the jury was in error in denying their claim under the "express warranty" provision of the LPLA. Because we conclude that assignment of error number three has merit, it is not necessary for us to address the issue set forth in assignment of error number four.
Louisiana Code of Civil Procedure article 1810, which governs directed verdicts, states as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
A trial court has much discretion in determining whether to grant a motion for directed verdict. New Orleans Property Development, Ltd. v. Aetna Casualty and Surety Company, 93-0692, p. 5 (La. App. 1 Cir. 4/8/94), 642 So.2d 1312, 1315. A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the party opposing the motion, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1 Cir. 2/15/91), writs denied, 577 So.2d 1009 (La.1991). However, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. Newpark Resources, Inc. v. Marsh & McLennan of Louisiana, Inc., 96-0935, pp. 4-5 (La.App. 1 Cir. 2/14/97), 691 So.2d 208, 211, writ denied, 97-0691 (La.4/25/97), 692 So.2d 1094.
On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Furthermore, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiffs claims. Theriot v. Bourg, 96-0466, p. 7 (La.App. 1 Cir. 2/14/97), 691 So.2d 213, 219, writ denied, 97-1151 (La.6/30/97), 696 So.2d 1008.
Pursuant to La. R.S. 9:2800.55, a product is unreasonably dangerous in construction or composition if, at the time the product left the manufacturer's control, the product deviated in a material way *665 from the manufacturer's specifications or performance standards for the product, or if the product deviated from otherwise identical products made by the same manufacturer.
Citing Ashley v. General Motors Corporation, 27,851 (La.App. 2 Cir. 1/24/96), 666 So.2d 1320, Ford asserts that the plaintiffs have failed to meet their burden of proof under La. R.S. 9:2800.55 in that they did not produce any evidence of the specifications or performance standards for the engine designed for use in the 1989 Ford Topaz. While we recognize that plaintiffs did not present any evidence of Ford's specifications or performance standards for the engine in question, we do not agree that Ashley is controlling here.
In Ashley, an allegedly defective accelerator system in a 1984 Oldsmobile Cutlass caused an accident resulting in personal injuries. At the time of the accident, the vehicle was five years old and had over 75,000 miles on the odometer. Ashley, 27,851 at 1, 666 So.2d at 1321. The court noted that not only did the plaintiffs fail to produce evidence regarding General Motors' specifications and performance standards for the accelerator system in question, but they also failed to prove that the accelerator system on their car deviated in any fashion from the identical system installed on similar cars. The court concluded that it could not infer the existence of a defect based solely on the fact that an accident occurred. Ashley, 27,851 at 4-5, 666 So.2d at 1322.
In the instant case, however, we are faced with a very different fact scenario. The engine in Ms. McNeely's 1989 Mercury Topaz failed approximately six months after the vehicle was purchased. It had only 3,800 miles on it at the time. The short block of the engine was replaced, and just seven months later, the engine failed again, this time with approximately 8,000 miles on the odometer.
Several automobile mechanics were called to testify on behalf of the plaintiffs regarding the cause of these engine failures. All of the mechanics were of the opinion that both engines in Ms. McNeely's vehicle failed due to a defective part that was manufactured by Ford. They further indicated that there was no evidence of customer abuse of the vehicle nor any other reasonable explanation for what caused the two engines to fail. The evidence revealed that the vehicle was properly maintained by Ms. McNeely in that she brought the vehicle in for regular oil changes and tune-ups.
According to Dennis Haffner, who worked at Town & Country Ford at the time in question, it was very unusual for this type of problem to occur with only 3,800 miles on an engine. In fact, Mr. Haffner testified that this particular vehicle would not have been scheduled for its initial servicing until the engine had approximately 5,000-7,000 miles on it. Mr. Haffner described the first engine failure in Ms. McNeely's vehicle as a "pretty major engine failure." Furthermore, he indicated that anytime a vehicle was repaired under warranty, such as in the case of Ms. McNeely's vehicle, it was because they had determined there to be a defect in the vehicle.
The Louisiana Supreme Court addressed a similar fact scenario in the case of Joseph v. Bohn Ford, Inc., 483 So.2d 934 (La.1986)[3]. In Joseph, the plaintiff purchased a van from an authorized Ford *666 dealer with a new car warranty. The brakes in the van failed approximately six weeks and 3,800 miles after the purchase. Joseph, 483 So.2d at 937. Finding no evidence of abnormal use, the court concluded, "[t]he failure of the brakes to function in the manner reasonably to be expected by the purchaser within such a short period of time creates a prima facie case that the product was defective and that the defect existed when the vehicle left the control of Ford Motor Company." Joseph, 483 So.2d at 941.
After reviewing the entire record, and considering the court's holding in Joseph, we conclude that the trial court erred in granting a directed verdict in favor of Ford on the issue of whether Ms. McNeely's vehicle was unreasonably dangerous in construction or composition. Based on the evidence presented to the jury, issues were raised upon which reasonable and fairminded individuals could disagree. Clearly, the facts and inferences did not overwhelmingly favor Ford's position that Ms. McNeely's vehicle was not unreasonably dangerous in construction or composition. Therefore, the trial court erred in granting Ford's motion for directed verdict and foreclosed any finding of fact on the part of the jury regarding this issue. This interdiction of the fact-finding process is a legal error requiring this court to review the case de novo from the record and render a judgment. Ferrell v. Fireman's Fund Insurance Co., 94-1252, pp. 3-4 (La.2/20/95), 650 So.2d 742, 745; Myers v. American Seating Company, 93-1350, p. 14 (La.App. 1 Cir. 5/20/94), 637 So.2d 771, 778-79, writs denied, 94-1569, 94-1633 (La.10/7/94), 644 So.2d 631, 632.
We have thoroughly reviewed the merits of this matter using a de novo standard of review and conclude that the plaintiffs produced sufficient evidence to prove that at the time Ms. McNeely's vehicle left Ford's control, it deviated from otherwise identical products made by Ford. In the instant case, as in Joseph, the vehicle in question was purchased from an authorized Ford dealer with a new car warranty. The engine in the vehicle failed with approximately 3,800 miles on it, and there was no evidence of owner abuse or abnormal use. Further, mechanics who testified on behalf of the plaintiffs indicated that it was very unusual for this type of failure to occur on an engine with only 3,800 miles, which would not normally be scheduled for its initial servicing until it had between 5,000 and 7,000 miles on it.
Having determined that the plaintiffs satisfied their burden of proof under the LPLA, we must now address the issue of damages. For the purposes of the LPLA, La. R.S. 9:2800.53(5) defines "damage" as follows:
"Damage" means all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery. "Damage" includes damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled "Redhibition," does not allow recovery for such damage or economic loss. Attorneys' fees are not recoverable under this Chapter.
According to the record, the plaintiffs asserted both a wrongful death action and a survival action. Each right arises at a different time and addresses itself to the recovery of damages for totally different injuries and losses. Taylor v. Giddens, 618 So.2d 834, 840 (La.1993). In a survival action, beneficiaries of the deceased have the right to recover the damages that the deceased suffered and would have been entitled to recover from the tort-feasor had the deceased lived. La. Civ.Code art. 2315.1. In a wrongful death action, if the deceased dies as a result of the tort, the named beneficiaries are granted the right to recover from the tort-feasor damages that they have sustained as a result of the deceased's wrongful death. La. Civ.Code art. 2315.2.
*667 Based on our review of the medical evidence in the record, we conclude that Ms. McNeely's death was not causally related to the injuries she sustained in the September 1990 incident. Thus, the plaintiffs cannot recover damages under their wrongful death action. However, it is clear that Ms. McNeely did in fact suffer some injuries, however minor, as a result of this incident. Thus, we will address the plaintiffs' survival action and determine an appropriate amount to compensate them for the injuries sustained by Ms. McNeely. Further, we will consider comparative fault on the part of Ms. McNeely and determine whether her recovery should be reduced in proportion to any percentage of negligence that may be attributable to her. See La. Civ.Code art. 2323.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident that caused the injury. The plaintiff must prove causation by a preponderance of the evidence. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615, p. 3 (La.2/20/95), 650 So.2d 757, 759. A tort-feasor is liable only for damages caused by his negligent act. He is not liable for damages caused by separate, independent or intervening causes. Haydel v. Hercules Transport, Inc., 94-1246, p. 23 (La.App. 1 Cir. 4/7/95), 654 So.2d 418, 432, writ denied, 95-1172 (La.6/23/95), 656 So.2d 1019.
Ms. McNeely testified that six days after the incident in September 1990, she saw Dr. Diamond, her family physician, with complaints of back and neck pain and migraine headaches.[4] She underwent X-rays of her back that revealed pulled muscles. According to Ms. McNeely, she began receiving therapy and taking pain medication and muscle relaxers for the pain. She stopped going to therapy after about a week because "it was making [her] worse." Ms. McNeely indicated that her back, neck, and head pains had not improved as of March of 1992.
Also testifying at the trial of this matter was Dr. Paul M. Doty, an orthopedic surgeon retained by Ford to examine Ms. McNeely. According to Dr. Doty, he saw Ms. McNeely in November 1993 for an independent medical examination at the request of Ford. Prior to examining Ms. McNeely, he reviewed her previous medical records, including the X-rays that were taken by Dr. Diamond after the September 1990 incident. His review of the records from Dr. Diamond revealed that Ms. McNeely had strained her neck, back and shoulder in the incident in question.
Regarding Dr. Doty's findings, following his examination of Ms. McNeely, Dr. Doty testified as follows:
Q. Explain for the jury, if you would, what your findings were at that time.
A. I saw Miss McNeely in November of 1993 as an independent medical examiner which meant that I hadn't seen her before and she was being seen purely as a fresh individual to render my opinion. I was also given records of previous past history of medical problems, illnesses, her injury and, of course, taken the history that she gave to me about the illness and about the injuries and about her symptoms.
It was my final impression at that time thatand I'll quoteshe presented as a heavy smoker already having medical problems, the nervous condition as well as multiple aches and pains treated by Dr. Diamond. It was my feeling that *668 she had sustained muscular ligamentous strains to her neck and back subsequent to bumping her head on the car in September of 1990 and injuring her back as well. But no acute bony changes took place, but her preexisting arthritic problems and osteoporosis were probably aggravated. As regards disk problems, it was impossible to know whether this preceded the accident or not. There were no tests done prior to the accident specific for disk herniation that we could use for comparison. It was my opinion that there was no pathology noted to which surgical intervention would benefit this patient. I did not feel it would behoove her in any manner and that was taking in account her general debilitated condition as well as the minor bone bulges, her disk bulges.
And at that time, I felt that the persistence of her pain could best be determined by Dr. Diamond or [Dr.] Vietz who had a chance to see her prior to her accident as compared to directly after her accident to determine at what point there was a difference due to the accident, at what point it went away from the accident and was merely there due to her chronic condition for which they had treated [her] prior to the accident.
I believe at that time she had received maximum medical benefit from her injuries but she will probably continue being symptomatic in the areas that I examined because of her degenerative condition, because of lumbar disk disease, the osteoporosis, alcoholism, smoking, and that she'd be treated for symptoms in those areas for years to come.
Q. Was it your opinion that the symptoms and the problems that developed as a result of the arthritis which preexisted and the osteoporosis which preexisted and the bone demineralization, that those problems might well have occurred even had this accident not happened?
A. Sure.
Q. Certainly, though there were records that indicated that she had been bruised during the accident and there was also some confirmation of a lumbar strain?
A. That's correct.
The only other medical evidence presented to the jury was the deposition testimony of Dr. Kenneth Adatto, an orthopedic surgeon who treated Ms. McNeely for the disk problems referred to by Dr. Doty. We have thoroughly reviewed the deposition of Dr. Adatto and find that his treatment of Ms. McNeely, which did not begin until March 13, 1992, was not causally connected to the September 1990 incident. Thus, we did not consider his treatment, diagnosis, or prognosis in assessing the amount of damages to which Ms. McNeely is entitled. Rather, we looked solely to the medical evidence regarding the muscle strain that Ms. McNeely sustained in this incident.
Having reviewed the record in its entirety, we initially note that any recovery to which Ms. McNeely is entitled should be reduced by 25 percent, a figure that we conclude represents the percentage of negligence attributable to her. It is clear from the evidence that Ms. McNeely's actions in attempting to get out of the vehicle in a hurried fashion were not reasonable and contributed to the injuries that she sustained. Based on our review of the medical evidence, we conclude that an award of $4,500.00, reduced by 25 percent for the percentage of negligence attributable to Ms. McNeely, would sufficiently compensate Ms. McNeely's surviving heirs for the injuries that she suffered in this incident. Thus, we award plaintiffs $3,375.00 in general damages. There is no evidence in the record regarding any special damages to which Ms. McNeely may be entitled. Therefore, we make no award for same.

REDHIBITION CLAIM

(Assignment of Error Number Two)
In assignment of error number two, plaintiffs assert that the jury erred in denying *669 recovery for their redhibition claim. According to the verdict that was returned in this case, the jury determined that although Ms. McNeely's vehicle contained redhibitory defects that rendered the vehicle absolutely useless for its intended purpose, the redhibitory defects did not exist at the time the vehicle left the custody and control of Ford; and thus, Ms. McNeely was not entitled to rescission of the sale.
Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold that renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice. La. Civ.Code art. 2520.[5] A buyer may bring an action against all sellers in the chain of sales back to the primary manufacturer to rescind the sale for breach of an implied warranty. Rey v. Cuccia, 298 So.2d 840, 845 (La. 1974); Womack and Adcock v. 3M Business Products Sales, Inc., 316 So.2d 795, 796 (La.App. 1 Cir.1975). In a suit for redhibition, the plaintiff must prove: 1) the seller sold the thing to him and it is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that, judged by the reasonable person standard, had he known of the defect, he would never have purchased it; 2) the thing contained a non-apparent defect at the time of sale; and 3) the seller was given an opportunity to repair the defect. Vincent v. Hyundai Corporation, 633 So.2d 240, 243 (La.App. 1 Cir.1993), writ denied, 93-3118 (La.2/11/94), 634 So.2d 832.
A defect is presumed to have existed before the sale if it manifests itself within three days immediately following the sale. La. Civ.Code art. 2530. This court has acknowledged that later appearing defects do not enjoy this presumption as a matter of law. See Rhodes v. All Star Ford, Inc., 599 So.2d 812, 814 (La.App. 1 Cir.1992). In Rhodes, however, we recognized that "in the absence of other explanations, later appearing defects may be inferred to have pre-existed the sale, when such defects do not usually result from ordinary use." Rhodes, 599 So.2d at 814. The existence of a redhibitory defect is a question of fact and should not be disturbed in the absence of manifest error. Id.
Generally, the amount of damages a plaintiff can recover because of a redhibitory defect depends upon the type of seller involved. Under La. Civ.Code art. 2531, a good faith seller, namely, one who knew not of the vices in the thing he sold, is required to repair, remedy, or correct the vices or defects in the property that he sold. If he is unable to do so, he must restore the purchase price with interest and reimburse the reasonable expenses occasioned by the sale and those expenses incurred for the preservation of the property. La. Civ.Code art. 2531; Landaiche v. Supreme Chevrolet, Inc., 602 So.2d 1127, 1132 (La.App. 1 Cir.1992).
The seller who knows the vice of the thing that he sells and omits to declare it is answerable to the buyer in damages. In addition to restitution of the purchase price and repayment of expenses, including reasonable attorney's fees, the bad faith seller is answerable for other damages. La. Civ.Code art. 2545. Under certain circumstances, those damages can include nonpecuniary damages for mental anguish, aggravation, and inconvenience. *670 Landaiche, 602 So.2d at 1132. It is well settled in Louisiana jurisprudence that a manufacturer is conclusively presumed to have knowledge of defects in the objects it manufactures. Young v. Ford Motor Company, Inc., 595 So.2d 1123, 1126 (La. 1992). Thus, because of this presumption of knowledge, the manufacturer "is deemed to be in bad faith in selling a defective product" and is liable to the buyer for all damages recoverable under Article 2545. Cox v. Lanier Business Products, Inc., 423 So.2d 690, 693 (La.App. 1 Cir.1982), writ denied, 429 So.2d 129 (1983).
We have thoroughly reviewed the record in the instant case and conclude that the jury erred in determining that the redhibitory defects in Ms. McNeely's vehicle were not present when the vehicle left the custody and control of Ford. The evidence presented by Ms. McNeely is sufficient in that an inference can be drawn that the defects were present in the vehicle at the time of the sale. Because the defects did not appear within three days of the sale, the plaintiffs cannot benefit from the presumption set forth in Article 2530. However, because the evidence has revealed that this type of engine failure does not "usually result from ordinary use," and there has been no other explanation for the engine failures, an inference can be drawn that the vehicle was defective when it left the custody and control of Ford. Thus, we reverse the jury's finding in this regard and address the issue of damages recoverable because of these redhibitory defects.
Ford, as manufacturer of the vehicle in question, "is deemed to be in bad faith in selling a defective product" and is liable to the buyer for all damages recoverable under Article 2545. See Cox, supra. Pursuant to Article 2545, a seller in bad faith "is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees."
According to the plaintiffs' petition for damages and the testimony of Ms. McNeely, the purchase price of the vehicle was $14,000.00. There was no other evidence introduced regarding the actual expenses occasioned by the sale of this particular vehicle or any interest paid. In fact, neither Ms. McNeely's brother nor her son, Joe D. McNeely, even testified at the trial of this matter. As they were responsible for purchasing this vehicle for Ms. McNeely, they would have been in the best position to testify regarding these other damages. Thus, we can only assess damages in the amount of $14,000.00 for the purchase price of the vehicle. Regarding the "reasonable attorney fees" that are also recoverable under Article 2545, the evidence in the record is insufficient for us to make a de novo award of attorney fees. Therefore, we will remand the matter to the trial court for a hearing to determine same.[6]

MENTAL ANGUISH DAMAGES

(Assignment of Error Number Five)
In assignment of error number five, plaintiffs assert that the jury erred in denying Ms. Brewer recovery for mental anguish under La. Civ.Code art. 2315.6. Louisiana jurisprudence supports an award for mental anguish and emotional distress arising out of injury to another when that person comes upon the scene of the event soon thereafter, provided that the trauma suffered by the victim is such that it can be reasonably expected that one in plaintiff's position would suffer serious *671 and foreseeable mental anguish from the experience. La. Civ.Code art. 2315.6; Lejeune v. Rayne Branch Hospital, 556 So.2d 559, 570 (La.1990). Moreover, the court in Lejeune noted that mental anguish for injury to a third person should only be allowed where the emotional injury is both severe and debilitating. In discussing this requirement, the court noted:
The emotional distress sustained must be both serious and reasonably foreseeable to allow recovery. Serious emotional distress, of course, goes well beyond simple mental pain and anguish. Compensation for mental pain and anguish over injury to a third person should only be allowed where the emotional injury is both severe and debilitating. For instance, Paugh v. Hanks, 6 Ohio St.3d 72, 451 N.E.2d 759, 765 (1983) held that "serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia and shock.
Lejeune, 556 So.2d at 570 (citations omitted).
We have carefully reviewed the entire record in this matter. While we acknowledge that Ms. Brewer may have been upset upon realizing that her mother had been injured while attempting to exit the vehicle, the record is devoid of any evidence that the distress she may have suffered was of a nature that could be categorized as "severe and debilitating" or that she was unable to cope with the situation. Thus, while we are sympathetic to the experience suffered by Ms. Brewer, she is not entitled to an award for mental anguish under Article 2315.6.

JUDGMENT NOTWITHSTANDING THE VERDICT

(Assignment of Error Number Six)
In the final assignment of error, plaintiffs allege that the trial court erred in failing to grant their motion for a judgment notwithstanding the verdict. Based on our findings above, we conclude that this issue is moot, and therefore, pretermit discussion of same.

CONCLUSION
For the above and foregoing reasons, the directed verdict by the trial court regarding the plaintiffs' claim that the vehicle in question was defective in construction and composition pursuant to the LPLA is reversed. Plaintiffs are awarded damages in the amount of $3,375.00 together with legal interest from the date of judicial demand for their survival action. Further, the jury's finding that the redhibitory defects in Ms. McNeely's vehicle did not exist at the time the vehicle left the custody and control of Ford is manifestly erroneous, and therefore, reversed. Plaintiffs are awarded $14,000.00 in damages together with legal interest from the date of judicial demand and all court costs of this proceeding. The matter is remanded to the trial court for a determination of attorney's fees. Costs associated with this appeal are assessed against defendant-appellee, Ford Motor Co., Inc.
REVERSED IN PART, RENDERED IN PART, AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
NOTES
[1] As will be discussed in detail later, Ms. McNeely died prior to the trial of this matter. However, her two pretrial depositions were read to the jury during the trial. Thus, all references to testimony by Ms. McNeely are to her deposition testimony as it was presented to the jury.
[2] A review of the record reveals that two supplemental and amending petitions were filed by the plaintiffs naming additional defendants. However, because these additional defendants, as well as all of the original defendants with the exception of Ford, were ultimately dismissed from the case by way of either a dismissal filed by the plaintiffs or summary judgment, it is not necessary to discuss this procedural history in great detail. The matter proceeded to trial against Ford alone.
[3] We recognize that Joseph was decided by the Louisiana Supreme Court prior to the enactment of the LPLA (effective September 1, 1988), and that the facts of this case arise after the effective date of said act. Nevertheless, under both the prior products liability jurisprudence (See, Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986)), and the provisions of the LPLA, a recognized cause of action is that a product can be unreasonably dangerous in its construction or composition. Both the prior law and the provisions of the LPLA require the defect contained within the product to exist at the time it left the manufacturer's control. The provisions of the LPLA did not change or legislatively reverse the presumption previously set forth in Joseph.
[4] Dr. Diamond was not called to testify at the trial of this matter, nor were any records regarding his treatment of Ms. McNeely introduced into evidence. Thus, all we have is the testimony of Ms. McNeely regarding Dr. Diamond's diagnosis and treatment of her alleged injuries following the incident in September 1990.
[5] The section of the Louisiana Civil Code governing redhibition was amended by Acts 1993, No. 841, § 1, effective January 1, 1995. Because the vehicle in question was purchased in 1989, the law in effect at that time governs, and all references in this opinion will use the language of the articles prior to revision. Accord, Palomo v. Leblanc Hyundai Partnership, 95-278, p. 8 (La.App. 5 Cir. 10/31/95), 665 So.2d 414, 420, writ denied, 96-0399 (La.3/22/96), 669 So.2d 1214. We note, however, that the 1993 revision comments indicate the law was not changed by the amendments and further state that there is only one cause of action in redhibition, whether the remedy is rescission of the sale or reduction in the purchase price.
[6] In assignment of error number one, plaintiffs allege that the trial court erred in dismissing their cause of action under Louisiana's "Lemon Law." Pursuant to La. R.S. 51:1944 and 51:1947, if plaintiffs were successful in pursuing a claim under Louisiana's "Lemon Law," they would not be entitled to recover anything more than the damages we have assessed in connection with their redhibition claim, i.e., return of the purchase price and reasonable attorney fees. Thus, we pretermit this issue.