823 So.2d 394 (2002)
John Paul PRATT, M.D.
v.
HIMEL MARINE, INC. and Mercury Marine
No. 2001 CA 1832.
Court of Appeal of Louisiana, First Circuit.
June 21, 2002.
*396 William L. Pratt, New Orleans, Counsel for Plaintiff/Appellee, John Paul Pratt, M.D.
Patrick J. O'Cain, New Orleans, Counsel for Defendant/Appellant # 1, Brunswick Corp.
Edwin S. Patout, New Iberia, Counsel for Defendant/Appellant # 2, RNL, Inc. d/b/a Himel Marine.
Arthur I. Robison, Lafayette, Counsel for Third-Party Defendant, Grady White Boats, Inc.
*397 Before: WHIPPLE, FOGG and GUIDRY, JJ.
WHIPPLE, J.
In this redhibition case, defendants, Mercury Marine ("Mercury") and Himel Marine, Inc.,[1] ("Himel Marine") appeal from the judgment of the trial court incorporating the jury's verdict, assessing fault and awarding damages in favor of the plaintiff, Dr. John Paul Pratt. Mercury also appeals the trial court's denial of its peremptory exception pleading the objection of prescription.[2] Also at issue herein is an exception of prescription filed by Himel Marine with this court, which was referred to the merits of the appeal.
On review of the merits of the case, we affirm in part, amend in part, vacate in part, and remand with instructions. We affirm the trial court's denial of Mercury's exception of prescription; and we deny Himel Marine's exception of prescription filed with this court.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
In April of 1995, Dr. Pratt purchased a pre-rigged, twenty-eight foot Grady White boat, equipped with two 1994 Mercury 225 horsepower, three liter outboard engines from Himel Marine, a certified Mercury dealer, operating in New Iberia. The purchase price was $103,405.87. Dr. Pratt, who was approaching retirement, was looking for the "ideal" retirement fishing boat.
Mercury manufactured the starboard engine in August of 1993 and sold it to Himel Marine in September of 1993. Mercury manufactured the port engine later, in January of 1994, and sold it to Himel Marine that same month. Himel Marine eventually installed the two engines on the Grady White boat, and rigged the boat with various accessories, including electronics, VHF radio with antenna, cellular antenna and electrical outlets, electric anchor windlass, life jackets, flare kit, throw ring, extinguishers, fuel filters, chain and rope, dock lines, boat fenders, antennas, depth finder, engine hour meters, carbon dioxide detector, and generator system, and sold the boat to plaintiff.
Pursuant to a service bulletin issued by Mercury, Himel Marine performed work on the starboard engine prior to its installation on the boat purchased by Dr. Pratt. Specifically, the capacitator discharge modules (CDMs) was changed, new drive seals were installed in the motor, a drill drive shaft housing was performed on the engine, new carburetors jets were placed in the engine, and a new alternator plug clamp was installed in the engine. In addition, pursuant to yet another service bulletin promulgated by Mercury, both the starboard and port engines were disassembled and repaired immediately before Dr. Pratt took delivery of the vessel. These facts were not disclosed to Dr. Pratt at the time of his purchase of the vessel.
After taking delivery of the boat, Dr. Pratt began experiencing multiple problems *398 with different systems on the vessel, including the two Mercury engines. At the time the problems began, Dr. Pratt contacted Ray Himel, owner of Himel Marine, for advice and repair of the various problems he was experiencing with the boat and engines. Himel Marine was then referring all of its service work to Acadiana Marine, a business near New Iberia.[3] Because Dr. Pratt continued to experience problems with the boat, and because there was no Grady White representative in the immediate area, Mr. Himel referred Dr. Pratt to Mr. Norman Pugh, who lived in LaCombe, who could more easily service the boat given the distance from plaintiff's location to Himel Marine.[4]
Among the multitude of problems Dr. Pratt experienced were: "burnt" power heads on both engines, which required replacement; chronic overheating problems with the engines, which necessitated numerous repairs; generator problems; accessory battery problems; a failed alternator, which required replacement with a new one; broken reed blocks, which had to be replaced; replacement of starter motor bushing; wiring and electrical problems; a rebuilt lower unit; problems requiring replacement of a lower unit with a new unit; steering problems; air conditioning problems; problems that required replacement of all original mountings; and problems with the lowrance.
On February 10, 1999, due to the constant state of disrepair and the volume of problems experienced with the boat and engines, and after numerous failed attempts to correct the majority and more severe of these problems (in particular, problems with the engines overheating, and problems with the generator, air conditioning, and electrical systems), Dr. Pratt instituted suit against Himel Marine and Mercury. He contended therein that "the vessel [was] unseaworthy" and "hazardous to operate over an extended period of time," and that the "vessel is unfit for use in its intended purpose."
On February 25, 1999, Himel Marine filed an answer, cross-claim, and third party demand against Mercury, seeking indemnification for all losses it may be liable for in the main demand as a result of any redhibitory or defective products manufactured by Mercury. On December 6, 1999, Himel Marine filed a third party demand against Grady White Boats, Inc. ("Grady White"), manufacturer of the vessel, seeking indemnification for any losses occurring as a result of any redhibitory or defective product manufactured by Grady White.
On June 12, 2000, Mercury filed a peremptory exception pleading the objection of prescription, which was denied by the trial court. Mercury then renewed its exception of prescription on July 3, 2000, which was again denied by the trial court.
The matter proceeded to trial before a jury, commencing December 4, 2001. Mercury again urged the exception of prescription at the close of the testimony at trial, which the trial court again denied. At the close of evidence presented by plaintiff, Dr. Pratt, and defendant/third party plaintiff, Himel Marine, Grady White moved for a directed verdict, which was granted by the trial court. After four days of testimony and evidence, the jury returned a verdict in favor of Dr. Pratt, and against Himel Marine and Mercury, rescinding the sale of the vessel and its *399 engines. The jury also found that the fully-rigged vessel with engines was redhibitorily defective when Himel Marine sold it to Dr. Pratt and that the defects rendered the vessel useless, or its use so inconvenient or unfit for its intended purpose that it must be presumed that Dr. Pratt would not have bought it had he known of the defects. The jury awarded Dr. Pratt expenses associated with the sale of the defective vessel and for preservation of the vessel in the amount of $23,450.00, and non-pecuniary damages in the amount of $12,500.00. The jury further found that Himel Marine was a good faith seller, concluding that the engines were defective when Mercury delivered them to Himel Marine and when Himel Marine sold the vessel to Dr. Pratt. The jury further attributed 65% of the redhibitory defectiveness to the "engines" and 35% of the redhibitory defectiveness to the "boat."
A judgment incorporating the jury's verdict and awarding Dr. Pratt attorney's fees in the amount of $45,000.00 and costs in the amount of $8,003.30 was rendered on March 13, 2001. The judgment set forth that Himel Marine and Mercury were jointly and severally liable, with 65% liability assessed to Mercury, and 35% liability assessed to Himel Marine, and ordered that all damages be apportioned accordingly. Himel Marine and Mercury both appeal from this judgment.
Mercury assigns the following as error:
1. The trial court erred when it denied Mercury's exception of prescription.
2. The jury erred when it found that the plaintiff's engines were redhibitorily defective at the time of sale.
3. The trial court erred in issuing a judgment that does not implement the jury's verdict and that holds Mercury responsible for defects in products that Mercury neither manufactured nor sold.
Himel Marine assigns the following as error:
1. The trial court erred in rendering a judgment that does not grant RNL, Inc. d/b/a Himel Marine, a good faith seller, full indemnification for the judgment rendered against it in the main demand, over and against the third party defendants, Mercury Marine and/or Grady-White Boats.
2. The trial court erred in rendering a judgment against RNL, Inc. d/b/a Himel Marine as a good faith seller for the payment of plaintiff[']s attorney[']s fees.

MERCURY'S ASSIGNMENT OF ERROR NO. 1 AND HIMEL'S EXCEPTION (Prescription)
In its first assignment, Mercury challenges the trial court's denial of its peremptory exception pleading the objection of prescription. Similarly, Himel Marine filed an exception of prescription, now before us on appeal.
Louisiana Civil Code Article 2534, which governs prescription claims arising from redhibitory defects, provides as follows:
A. (1) The action for redhibition against a seller who did not know of the existence of a defect in the thing sold prescribes in four years from the day delivery of such thing was made to the buyer or one year from the day the defect was discovered by the buyer, whichever occurs first.
(2) However, when the defect is of residential or commercial immovable property, an action for redhibition against a seller who did not know of the existence of the defect prescribes in one year from the day delivery of the property was made to the buyer.
B. The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year *400 from the day the defect was discovered by the buyer.
C. In any case prescription is interrupted when the seller accepts the thing for repairs and commences anew from the day he tenders it back to the buyer or notifies the buyer of his refusal or inability to make the required repairs.
Thus, the period for an action for redhibition against a seller who did not know of the existence of a defect in the thing sold prescribes four years from the day of delivery of the thing, or one year from the day the defect was discovered by the buyer, whichever comes first. Against a seller who knew or is presumed to have known of the defect, the action prescribes one year from the day the defect was discovered by the buyer. LSA-C.C. art. 2534; DM & M v. Modern Auto Wreckers, Inc., 98-2514, p. 3 (La.App. 4th Cir.3/31/99), 731 So.2d 1007, 1008-1009.
However, it is well settled that the one-year prescriptive period is interrupted by the seller's attempts to repair defects. LSA-C.C. art. 2534C; Bell v. Battles, 532 So.2d 479, 480 (La.App. 1st Cir.1988). If the seller attempts to remedy the defect, the prescriptive period does not start to run "until all attempts to repair the defect are abandoned by the seller or until the last promise of repair is made by the seller to the buyer." Don Smart & Associates-Century 21 v. Lanier Business Products, 551 So.2d 665, 670-671 (La.App. 1st Cir. 1989).
The standard controlling review of a peremptory exception of prescription requires that this court strictly construe the statutes "against prescription and in favor of the claim that is said to be extinguished." Louisiana Health Service and Indemnity Company v. Tarver, 93-2449, pp. 11-12 (La.4/11/94), 635 So.2d 1090, 1098; Fontaine v. Roman Catholic Church of Archdiocese of New Orleans, 625 So.2d 548, 551 (La.App. 4th Cir.1993), writ denied, 93-2719 (La.1/28/94), 630 So.2d 787.
The jury found, and the record evidence amply demonstrates, that Himel Marine did not know nor should it have known that the vessel rigged with these engines was redhibitorily defective when sold to Dr. Pratt. Therefore, this section against Himel Marine is timely if commenced within one year of discovery of the defect or four years from the date of delivery. The record established that not until November 24, 1998, at the earliest, when Dr. Pratt was informed of service bulletin 96-21 concerning overheating repairs, did he become sufficiently aware of the vessel's engine problems to begin the running of prescription. Thus, Himel Marine is clearly subject to a four year prescriptive period. See LSA-C.C. art. 2534. Dr. Pratt's claims were asserted well within the prescriptive period and Himel Marine's exception of prescription raised on appeal lacks merit.
With regard to Mercury's exception of prescription, Dr. Pratt contends that, considering the totality of the numerous problems and continuous repair attempts by Mercury, prescription was clearly interrupted. He contends that the record is clear that he did not know of the defects and re-design of the engines after they left the factory, and, in fact, he did not learn of these defects except in the course of the litigation. Thus, relying on the doctrine of contra non valentem, he contends the trial court correctly rejected Mercury's exception. On review, we agree, and find no error by the trial court in this regard.
The doctrine of contra non valentem prevents the running of prescription where, among other things, a cause of action is neither known nor knowable by *401 plaintiff even though plaintiff's ignorance is not induced by defendant. Brunett v. Department of Wildlife and Fisheries, 96-0535, 96-0536, p. 6 (La.App. 1st Cir.12/20/96), 685 So.2d 618, 621, writ denied, 97-0186 (La.3/14/97), 689 So.2d 1385; David v. Meek, 97-0523, p. 7 (La. App. 1st Cir.4/8/98), 710 So.2d 1160, 1164. The doctrine of contra non valentem prevents the running of liberative prescription where the cause of action clearly is not known or reasonably knowable by the plaintiff. Cole v. Celotex Corporation, 620 So.2d 1154, 1156 (La.1993).
In support of his position, Dr. Pratt testified that he was not aware of any of the numerous service bulletins that had been promulgated and issued by Mercury to its dealers commanding the "repair" of the brand-new engines. In particular, he was not aware of two service bulletins, namely service bulletin 94-11 and service bulletin 93-20, that were issued to correct defects with his engines prior to his purchase of the engines. Pursuant to service bulletin 94-11, the starboard and port engines were completely disassembled and repairs attempted prior to his purchase of the engines. Pursuant to service bulletin 93-20, the starboard engine was disassembled for installation of, inter alia, new CDM's, new drive shaft seals, new carburetor jets, new alternator plug cap, performance of a drill drive shaft housing on the engine, and removal of the starter rope packet. Dr. Pratt testified that he was never informed of these "repairs" at the time of his purchase of the new engines, that he did not discover until trial that these service bulletins had been promulgated, and that service efforts had been attempted in response thereto, on what he thought were two brand new Mercury engines. Dr. Pratt testified that he had no confidence in the engines at all and that had he known of these inherent design problems, he would never have purchased the engines. Instead, he believed that the problems with the engines could be corrected and he continued to allow Mercury and Himel Marine to repair what he thought could be fixed at the time. Until trial, Dr. Pratt was unaware that the problems with his engines arose from failures admittedly due to a defect in design.
In particular, Himel Marine's head mechanic, Vernon Bacque, testified that these particular motors had a serious problem keeping the prop cool with water. He testified that Mercury issued a service bulletin and repair kit in order to repair the problem and that the "repairs" were performed by one of his mechanics on both of Dr. Pratt's engines prior to Dr. Pratt's purchase of the engines. When asked whether he thought the customer should have been informed of these "repairs" prior to purchase, Bacque responded, "I don't know." When asked whether he would like to know what has been done to his engine before he purchased it, Bacque responded, "I don't know.... I wasn't told to tell the customers."
Larry Aranyosi, accepted by the trial court as an expert in service bulletins and repairs of outboard motors, testified that he was familiar with the service bulletins promulgated and issued regarding these particular engines. He testified that the reason Mercury issues service bulletins is usually to correct a problem and "get it right" for the customer. Aranyosi further testified that it was not uncommon to see three-liter Mercury engines like those purchased by Dr. Pratt experience overheating problems and that there was an inordinate amount of overheating or power head failures with the Mercury three-liter engines. Aranyosi testified that after surveying and running both of Dr. Pratt's engines, considering the number of problems with the engines, he was not sure that the engine problems could ever be *402 corrected. Aranyosi testified that in the course of attaining certification as a Mercury technician, he had become aware that the first generation three-liter Mercury engines, like those of Dr. Pratt's, had manifested problems mainly with overheating, and, that Mercury was trying to correct these problems "in the field."[5] When asked about the engines' dependability, he stated that in his experience repairing these engines, he had seen so many problems and customer complaints, that he was "not too much on them." Aranyosi further testified that if given one of the Mercury first generation three-liter engines, he would "probably scrap it out and sell it for parts or something."
Eric Lamoray, a marine surveyor who by profession examines and evaluates the seaworthiness of vessels, and a previous co-owner of Riverview Marine, testified that he was very familiar with Dr. Pratt's boat as he had worked on it when it was in his "yard" for over six months. Lamoray described in detail an "ongoing problem with getting the engines to work properly with the electrical wiring and charging systems on the boat." He testified that the boat could be run for approximately ten minutes at cruising RPM before the motors would begin to overheat. He stated that after extensive repairs, they were able to get the motors to run to about fifteen minutes before the motors would overheat, but despite their best efforts, the motors still misfired "a lot" and "were not running as smooth as they should." Lamoray testified that when these system failures reached the point where this was obviously not a normal, repairable problem and was a warranty situation, he recommended that Dr. Pratt contact the Mercury dealer. In reference to service bulletin 93-20, Lamoray testified that it appeared to him that the engines, as originally configured, were having a cooling problem and that the purpose of the bulletin was to try to increase "the water area [so] the water can move." Lamoray determined that these problems were attributable to some sort of engineering or design problem that had to be addressed, which he considered to be a defect. Lamoray considered the service bulletins to be an attempt to solve a cooling problem that was inherent, and that this inherent defect would have come with the engines from the manufacturer in the design or pre-manufacture stage. Lamoray opined that the vessel was not sufficiently seaworthy to take out of sight of land with the motors it had on it.
Travis Hayes, a company representative for Mercury Marine, testified that he was called out to "troubleshoot" Dr. Pratt's engines as late as February of 1999. He conceded that it was "possible" that the engines were built defectively. Hayes further testified that even as of the time of trial, he was not sure if service bulletin 94-11, which was issued to correct certain problems with the engines, actually corrected the defects.
As the record overwhelmingly demonstrates, Dr. Pratt was not aware of the extensive work and "repairs" performed on these engines pursuant to Mercury service bulletins prior to purchase. Moreover, considering that he was not made aware that the engines were not "fixable" and that there was an inherent problem or defect in the design of the engines themselves until the institution of these proceedings, *403 we find the doctrine of contra non valentem is clearly applicable herein. Accordingly, we find no error on the trial court's conclusion that prescription of plaintiff's claims against Mercury had not run.
Thus, these arguments lack merit.

MERCURY'S ASSIGNMENT OF ERROR NO. 2 (Existence of Redhibitory Defects)
In this assignment, Mercury contends that the jury erred when it found that the plaintiff's engines were redhibitorily defective at the time of sale.
The seller warrants the buyer against redhibitory defects, or vices, in the thing sold; a defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect, or else of such diminished usefulness and value that the buyer would only have purchased the thing for a lesser price. The existence of a redhibitory defect gives the buyer the right to obtain rescission of the sale where the thing is rendered useless, or the right to have the price reduced where the thing is found to be of lesser value as a result. LSA-C.C. art. 2520.
A buyer may bring an action against all sellers in the chain of sales back to the primary manufacturer to rescind the sale for breach of an implied warranty. Rey v. Cuccia, 298 So.2d 840, 845 (La. 1974); McNeely v. Ford Motor Company, Inc., 98-2139, p. 15 (La.App. 1st Cir.12/28/99), 763 So.2d 659, 669, writ denied, XXXX-XXXX (La.4/28/00), 760 So.2d 1182. In a suit for redhibition, the plaintiff must prove: 1) the seller sold the thing to him and it is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that, judged by the reasonable person standard, had he known of the defect, he would never have purchased it; 2) the thing contained a non-apparent defect at the time of sale; and 3) the seller was given an opportunity to repair the defect. McNeely, 98-2139 at p. 15, 763 So.2d at 669; Vincent v. Hyundai Corporation, 633 So.2d 240, 243 (La.App. 1st Cir.1993), writ denied, 93-3118 (La.2/11/94), 634 So.2d 832.
A defect is presumed to have existed before the sale if it manifests itself within three days immediately following the sale. LSA-C.C. art. 2530. However, later appearing defects do not enjoy this presumption as a matter of law. See Rhodes v. All Star Ford, Inc., 599 So.2d 812, 814 (La.App. 1st Cir. 1992). Nonetheless, as this court has previously recognized, "in the absence of other explanations, later appearing defects may be inferred to have pre-existed the sale, when such defects do not usually result from ordinary use." Rhodes, 599 So.2d at 814. The existence of a redhibitory defect is a question of fact and should not be disturbed in the absence of manifest error. Rhodes, 599 So.2d at 814.
Generally, the amount of damages a plaintiff can recover because of a redhibitory defect depends upon the type of seller involved. Pursuant to LSA-C.C. art. 2531, a good faith seller, namely, one who knew not of the vices in the thing he sold, is required to repair, remedy, or correct the vices or defects in the property that he sold, If he is unable to do so, he must restore the purchase price with interest and reimburse the reasonable expenses occasioned by the sale and those expenses incurred for the preservation of the property. LSA-C.C. art. 2531; McNeely, 98-2139 at p. 16, 763 So.2d at 669.
The seller who knows the vice of the thing that he sells and omits to *404 declare it is answerable to the buyer in damages. In addition to restitution of the purchase price and repayment of expenses, including reasonable attorney's fees, the bad faith seller is answerable for other damages. LSA-C.C. art. 2545. Under the proper circumstances, those damages can include nonpecuniary damages for mental anguish, aggravation, and inconvenience. Landaiche v. Supreme Chevrolet, Inc., 602 So.2d 1127, 1132 (La.App. 1st Cir.1992). A manufacturer is conclusively presumed to have knowledge of defects in the object it manufactures. Young v. Ford Motor Company, Inc., 595 So.2d 1123, 1126 (La.1992). Thus, because of this presumption of knowledge, the manufacturer "is deemed to be in bad faith in selling a defective product" and is liable to the buyer for all damages recoverable under Article 2545. Cox v. Lanier Business Products, Inc., 423 So.2d 690, 693 (La.App. 1st Cir.1982), writ denied, 429 So.2d 129 (La. 1983).
We have thoroughly reviewed the extensive record in this case. Upon review, we conclude that the jury did not err in determining that the "fully-rigged vessel with engines was redhibitorily defective when Himel Marine sold it to Dr. Pratt." Considering the testimony outlined above, and the overwhelming evidence and voluminous testimony in this case, we find the evidence presented by Dr. Pratt is abundantly sufficient to show that the defects were present in the fully-rigged vessel and engines at the time of the sale. Thus, we find no manifest error in the jury's conclusion that the engines were redhibitorily defective at the time of sale.
This assignment lacks merit.

MERCURY'S ASSIGNMENT OF ERROR NO. 3 (Implementation of the Jury's Verdict)
In this assignment, Mercury contends that the trial court erred in issuing a judgment that does not implement the jury's verdict. Specifically, Mercury contends that it should not be held responsible for defects in the fully-rigged vessel, a product that Mercury neither manufactured nor sold. Mercury contends that its liability should be limited to damages or losses strictly attributable to the engines it manufactured and sold.
The jury found that the "engines" contributed to 65% of the vessel's redhibitory defectiveness and that the "boat" contributed to 35% of the vessel's redhibitory defectiveness. The trial court implemented the jury's verdict by rendering a judgment casting Mercury jointly and severally liable for 65% of the costs of rescission of the sale ($103,405.82), pecuniary damages ($23,450.00), non-pecuniary damages ($12,500.00), attorney's fees ($45,000.00), and costs ($8,003.30).
Louisiana Civil Code article 2545 addresses damages and provides, as follows:
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.
As manufacturer of the engines only, Mercury argues that the trial court can only assess Mercury with 65% of the damages *405 and attorney's fees incurred if attributable to the redhibitory defects in the engines. Because Mercury neither manufactured nor sold Dr. Pratt's boat, Mercury contends, it cannot be held liable to Dr. Pratt for the purchase price, damages, interest, expenses, and fees incurred in connection with anything other than the engines.
At the outset, we note that the jury verdict form used herein obligated the jury to decide whether the "fully rigged vessel with engines" was redhibitorily defective when sold to Dr. Pratt. The jury was then asked to determine to what extent did the "engines" and "boat" contribute to the redhibitory defectiveness of the vessel as a whole. Notably, the record does not contain any objection as to the verdict form used herein.
Also, after a thorough review of the record and evidence, we find the record devoid of any evidence to indicate the particular costs of the Mercury engines or to show that the engines were sold as a separate, non-integral part of the vessel and its systems. Furthermore, we find that the testimony and evidence clearly show that the Mercury engines contained a dangerous defect that rendered the entire vessel unseaworthy, not useable for its intended purpose, and inoperable under normal use.
In Morvant v. Himel Marine, Inc., 520 So.2d 1194, 1198 (La.App. 3rd Cir.1988), another suit for redhibition against Himel Marine, the Third Circuit determined that the "boat, motor and trailer, as separate items, [were] of no practical utility to plaintiff." The court further noted that the "separate items, boat, motor and trailer, were assembled and sold ... as a single unit and should be so considered" for the purpose of an action in redhibition.[6] We agree.
We note that the jury found that the "fully-rigged vessel with engines" as a whole was redhibitorily defective, not merely the "boat" or the "engines" alone. Thus, we find that the trial court correctly implemented the jury's assessment of fault to Mercury herein.
This assignment also lacks merit.

HIMEL MARINE'S ASSIGNMENT OF ERROR NO. 1 (Indemnification)
Himel Marine argues that the trial court erred in failing to grant Himel Marine, as a "good faith seller," full indemnification for the judgment rendered against it in the main demand, over and against Mercury and/or Grady White Boats. Further, Himel Marine challenges the trial court's grant of Grady White's motion for directed verdict at the close of the evidence presented by Dr. Pratt and Himel Marine at trial. Louisiana Code of Civil Procedure article 1810 provides as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
*406 A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991). A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. New Orleans Property Development, Limited v. Aetna Casualty and Surety Company, 93-0692, p. 5 (La.App. 1st Cir.4/8/94), 642 So.2d 1312, 1315; Barnes, 578 So.2d at 1162. However, if there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. New Orleans Property Development, Limited, 93-0692 at p. 5, 642 So.2d at 1315.
On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827, 849 (La.App. 1st Cir.), writs denied, 605 So.2d 1117, 1119 (La.1992). It is axiomatic that the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiffs claims. New Orleans Property Development, Limited, 93-0692 at p. 6, 642 So.2d at 1315.
Pursuant to LSA-C.C. art. 2522:
The buyer must give the seller notice of the existence of a redhibitory defect in the thing sold. That notice must be sufficiently timely as to allow the seller the opportunity to make the required repairs. A buyer who fails to give that notice suffers diminution of the warranty to the extent the seller can show that the defect could have been repaired or that the repairs would have been less burdensome, had he received timely notice.
Such notice is not required when the seller has actual knowledge of the existence of a redhibitory defect in the thing sold.
The evidence presented at trial showed that the only complaint Grady White received about the vessel concerned the air conditioner. Vernon Bacque testified that in response to Dr. Pratt's complaints about the air conditioner, Grady White referred him to the manufacturer of the air conditioner. Grady White's records indicate that it was contacted about the air conditioning on August 8, 1996, at which time, the air conditioner was out of warranty. Nonetheless, Grady White purchased and paid for the installation of a new water pump for the air conditioner. Other than this isolated incident, the record is devoid of any showing that Grady White had notice of any other redhibitory defects or problems with the vessel.
Furthermore, LSA-C.C. article 2531 provides, in pertinent part, that:
A seller who is held liable for a redhibitory defect has an action against the manufacturer of the defective thing, if the defect existed at the time the thing was delivered by the manufacturer to the seller, for any loss the seller sustained because of the redhibition. Any contractual provision that attempts to limit, diminish or prevent such recovery by a seller against the manufacturer shall have no effect.
Pursuant to LSA-C.C. 2530, the warranty against redhibitory defects covers only defects that exist at the time of delivery. *407 The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time.
To prevail on its claim for indemnification, Himel Marine was required to prove that any redhibitory defect with the vessel existed at the time the vessel was delivered by Grady White to Himel Marine and, also, to prove that the loss sustained was a result of the defect. The testimony shows that once the boat was delivered to Himel Marine by Grady White, Himel Marine was responsible for rigging the vessel with the two Mercury engines, and outfitting the boat with various accessories of its choosing, which included electronics, VHS radio with antenna, cellular antenna and electrical outlets, engine hour meters, electric anchor windlass, life jackets, fuel filters, chain and rope, dock lines, extinguishers, throw ring, flare kit, boat fenders, antennas, depth finder, carbon dioxide detector, and generator system. Noticeably absent from the record is any showing that Grady White was responsible for (or even had any notice of) the problems that Dr. Pratt experienced with these components, either individually or combined as a "fully-rigged vessel." As such, Grady White was never requested or provided an opportunity to cure or repair any supposed defects Himel Marine now attributes to Grady White.
After reviewing the record and the evidence submitted, we conclude that the facts and inferences were so overwhelmingly in favor of Grady White, as the party moving for dismissal of any claim against it, that reasonable people could not reach a contrary verdict. Therefore, we find that the trial court did not err in granting Grady White's motion for directed verdict.
As to whether Himel Marine may seek indemnification against Mercury, as the manufacturer of the engines, we note that in this case, as stated above, the jury found the "fully-rigged vessel with engines" to be defective. The testimony shows that aside from the problems with the engines and those associated therewith, there were numerous electrical problems, windlass problems, generator problems, air conditioning problems, and other miscellaneous problems. The record is devoid of any evidence that would show that Mercury was responsible for these defects. Mercury did not hold itself out as the manufacturer of any of these particular parts of the rigged vessel. Also, the testimony and evidence clearly show that Himel Marine was responsible for installing and rigging the above systems.
For these reasons, we find no merit to this assignment of error.

HIMEL MARINE'S ASSIGNMENT OF ERROR NO. 2 (Attorney's Fees)
Lastly, we address whether the trial court correctly assessed attorney's fees against Himel Marine.
When asked if "Himel Marine knew or should have known that the rigged vessel with engines was redhibitorily defective when it was sold to Dr. Pratt," the jury answered "No," thereby finding that Himel Marine was "a good faith seller." As such, Himel Marine was only bound to repair, remedy, or correct the defect. If unable to do so, a good faith seller is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which a seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer. LSA-C.C. art. 2531.
Pursuant to LSA-C.C. art. 2545, a seller in bad faith "is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement *408 of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees." However, as a seller in good faith, pursuant to LSA-C.C. art. 2531, Himel Marine was only bound to repair, remedy, or correct the defect. Thus, in accordance with the jury's finding that Himel Marine was a good faith seller, Dr. Pratt is statutorily barred from recovering attorney's fees from Himel Marine.
Finding merit to this assignment, we amend the judgment to vacate the trial court's award of attorney's fees against Himel Marine. As against Mercury, attorney's fees clearly are due. Thus, we remand the matter to the trial court for a hearing. On remand, the court shall allow the parties to present testimony and evidence as needed to determine the amount of attorney's fees attributable to the prosecution of Dr. Pratt's claims against Mercury and should render judgment accordingly.

CONCLUSION
For the above and foregoing reasons, the March 13, 2001 judgment of the trial court implementing the jury's verdict is affirmed in part, amended in part, vacated in part, and remanded with instructions. Himel Marine's peremptory exception of prescription is denied. Costs of this appeal are assessed equally among appellants, Mercury Marine and Himel Marine, Inc.
AFFIRMED IN PART; AMENDED IN PART; VACATED IN PART; AND REMANDED, WITH INSTRUCTIONS.
NOTES
[1] Subsequent to the institution of this litigation, counsel for Himel Marine, Inc. began referring to Himel Marine as "RNL, Inc. d/b/a Himel Marine formerly known as Himel Marine, Inc." For consistency, we shall refer to this defendant as Himel Marine herein.
[2] Although the trial court's written judgment of March 13, 2001 does not specifically address Mercury's exception of prescription, the transcript shows that the exception was denied by the trial court during these proceedings on at least three occasions. Furthermore, silence in a judgment as to any part of a demand or any issue litigated is construed as a rejection of that claim or issue by the trial court. Succession of Brantley, 96-1307, p. 9 (La.App. 1st Cir.6/20/97), 697 So.2d 16, 20.
[3] At the time of trial, Acadiana Marine was no longer in business.
[4] Subsequently, additional repair work was performed on the boat and engines by Metro Boating, Country Stop Marine, and Riverview Marine Services.
[5] Although disputed by Mercury, Aranyosi testified that one of the "teachers" at the Mercury technician school told him that normally the "Mercury performance group" tests the engines before they are released to the general public, but this particular engine was not tested prior to its release. He testified that "normally when a performance group gets it, they can usually iron out a lot of problems before the general public gets it."
[6] Mercury erroneously contends in brief that the Morvant court limited recovery to the amount of the "boat" only. A close reading of the case indicates that the court explained that the term "boat" encompassed the motor and trailer as well.