924 So.2d 178 (2005)
Cleveland J. WRIGHT, Annie Mae Anderson, Daisy Mae Pursley, Yvonne Johnson, Lawanda R. Hall, Linda Denise Harris, Letha Wheeler & Kimberly Armstead
v.
Roger BENNETT, Pete Pearson, Wendell Carrier, Eloise Moore, Linda Stewart, Richfield Hotel Management & Gibbens Co., Inc.
No. 2004 CA 1944.
Court of Appeal of Louisiana, First Circuit.
September 28, 2005.
*180 John B. Lambremont, Sr., L. Stephen Rastanis, Baton Rouge, Counsel for Plaintiffs/Appellants, Cleveland J. Wright, et al.
S. Gene Fendler, New Orleans, Counsel for Defendants/Appellees, Richfield Hotel Management, Inc., Roger Bennett, Pete Pearson, Wendell Carrier & John Blount.
Before: WHIPPLE, McCLENDON, and WELCH, JJ.
WHIPPLE, J.
In this appeal, plaintiffs, a group of eight African-American restaurant workers, challenge a judgment, rendered in conformity with a jury verdict, dismissing plaintiffs' employment discrimination claims with prejudice and awarding attorneys fees in the amount of $5,000.00 to defendants. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
Plaintiffs, Cleveland J. Wright, Annie Mae Anderson, Daisy Mae Pursley, Yvonne Johnson, Linda Denise Harris, Letha Wheeler, and Kimberly Armstead, were employed in the "Sadie Mae" restaurant located in the Sheraton Hotel in Baton Rouge, Louisiana until August 9, 1993, when they were discharged. Due to high food costs and suspicions about handling of revenues, an investigation had ensued, including the use of off-duty East Baton Rouge Parish sheriff's deputies. According to the hotel's general manager, the investigation revealed irregularities in the usage of guest checks, missing checks, and failure to properly close out some checks.
The reason for discharge, as stated on their "pink slips," was "Careless or inefficient performance of duties including failure to maintain proper standards of workmanship." *181 Plaintiff, Lawanda Hall, was subsequently discharged on August 24, 1993, for "violation of company rules and policies regarding proper closing manner." Plaintiffs, however, contended that the true reason for their discharge was "racially motivated/based."
According to plaintiffs, all of the replacements, except one were young white females. After being fired, plaintiffs sought unemployment benefits, which were contested by defendant Richfield Hotel Management, the management company operating the hotel and directly employing plaintiffs. After benefits were awarded to four of the plaintiffs, Richfield dropped its opposition to unemployment compensation benefits for the remaining plaintiffs.
Thereafter, on December 17, 1993, plaintiffs filed a petition for damages, back pay, and attorney's fees alleging intentional racial discrimination in their employment in violation of LSA-R.S. 23:1006,[1] Specifically, plaintiffs instituted suit for racial discrimination, defamation, conspiracy to defraud plaintiffs of their unemployment compensation benefits, and violation of their federal civil rights. Named as defendants were: Richfield Hotel Management, Roger Bennett, Pete Pearson, Gibbens Co., Inc., Linda Stuart, Eloise Moore, and Wendell Carrier.[2]
In the petition, plaintiffs alleged that the defendants discriminated against them as well as other African-American employees with respect to the terms, wages, conditions, privileges, advantages, and benefits of their employment with the defendants. Plaintiffs contended that defendants publicly accused them of theft of company funds in an attempt to defraud them of unemployment compensation benefits and actively conspired to defraud them and improperly deprive them of benefits lawfully due. Plaintiffs further contended that Richfield Hotel Management was responsible under the doctrine of respondeat superior for the tortious acts of its employees, Bennett, Pearson and Carrier, carried out in the course and scope of their employment.
Defendants, Richfield, Bennett, and Carrier (collectively "Richfield") answered the petition, generally denying the allegations, and filed a reconventional demand against the eight plaintiffs. In the reconventional demand, Richfield contended that plaintiffs' racial discrimination claims were frivolous and that the original lawsuit had been filed solely for the purpose of harassing Richfield. Richfield further contended that plaintiff Wright was fully aware that African Americans were employed by the Sheraton in supervisory, managerial, professional and clerical jobs, and that Wright maliciously caused an article to be published in The Advocate, on December 21, 1993, entitled, "Former Hotel Workers Filed Discrimination Suit" on December 21, 1993. Richfield contended that it accordingly was entitled to damages, including attorney's fees and court costs, as a result of plaintiffs' frivolous claims.
On June 28, 1994, plaintiffs filed an amending and supplemental petition adding John Blount and Aetna Life Insurance Company as defendants.[3] In the amended *182 petition, plaintiffs set forth additional allegations, including violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. Sections 1981, 1985(c), and/or 1988, and requested any relief afforded under these provisions. Richfield answered the first amending and supplemental petition, generally denying plaintiffs allegations, and asserting as an affirmative defense that plaintiffs had failed to mitigate their damages as required by law.
The matter proceeded to trial by jury on October 7 -17, 1996. The jury returned its verdict on October 17, 1996. However, a written judgment in conformity with the jury's verdict, dismissing plaintiffs' claims against the defendants with prejudice was not rendered until December 30, 2002. The judgment also awarded the defendants' attorney's fees in the amount of $5,000.00.
On January 13, 2003, plaintiffs filed a motion for JNOV and in the alternative, a motion for new trial, which were denied by the successor judge in the district court. Plaintiffs filed the instant appeal, assigning the following as error:[4]
1. The verdict rendered by the jury was clearly contrary to the law and evidence, and plaintiff-appellants are entitled to a new trial pursuant to Louisiana Code of Civil Procedure Article 1972(1).
2. The trial court committed legal error in the following evidentiary rulings:
a. Not allowing into evidence John Blount's sexual harassment of white, female bartenders at the hotel.
b. Allowing after-acquired evidence to be admitted on behalf of the defendants in the form of expert accounting testimony from Peat-Marwick witnesses when the testimony bore no relevance to the proceedings, and
c. Allowing Cleveland Wright's post-employment guilty plea to one count of felony theft to be submitted to the jury.
3. The trial court committed legal error in granting the defendants' directed verdict as to the plaintiffs' defamation claims against the Richfield defendants.
4. Given assignments of error two and three, the plaintiffs are entitled to a new trial on discretionary grounds pursuant to Louisiana Code of Civil Procedure article 1973.

EVIDENTIARY RULINGS
(Assignment of Error Number Two)
In this assignment, plaintiffs contend that the trial court made several erroneous evidentiary rulings. If a trial court commits evidentiary error that interdicts its fact-finding process, this court must conduct a de novo review. Thus, any alleged evidentiary errors must be addressed first on appeal, inasmuch as a finding of error may affect the applicable standard of review. See Bolton v. B E & K Construction, XXXX-XXXX, p. 3 (La.App. 1st Cir.6/21/02), 822 So.2d 29, 32.
Plaintiffs contend that the trial court committed legal error in: (1) not allowing evidence of Blount's sexual harassment of white, female bartenders at the hotel; (2) allowing after-acquired evidence to be admitted on behalf of defendants in the form of expert accounting testimony; and (3) allowing Wright's post-employment guilty *183 plea to one count of felony theft to be submitted to the jury.
Louisiana Code of Evidence article 103(A) provides, in part, that "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." The proper inquiry for determining whether a party was prejudiced by a trial court's alleged erroneous ruling on the admission or denial of evidence is whether the alleged error, when compared to the entire record, had a substantial effect on the outcome of the case. If the effect on the outcome of the case is not substantial, reversal is not warranted. LSA-C.E. art. 103(A). The party alleging prejudice by the evidentiary ruling of the trial court bears the burden of so proving. Emery v. Owens-Corporation, 2000-2144, p. 7 (La. App. 1st Cir.11/9/01), 813 So.2d 441, 449, writ denied, XXXX-XXXX (La.5/10/02), 815 So.2d 842. Generally the trial court is granted broad discretion in its evidentiary rulings and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. Turner v. Ostrowe, XXXX-XXXX, p. 5 (La.App. 1st Cir.9/27/02), 828 So.2d 1212, 1216, writ denied, 2002-2940 (La.2/7/03), 836 So.2d 107.

Evidentiary Ruling No. 1
On October 1, 1996, defendants filed a motion in limine seeking to exclude certain evidence and testimony on the grounds that it was irrelevant, highly prejudicial, and that its prejudicial and misleading effect would far outweigh any probative value it could possibly have. The evidence the defendants sought to exclude included records of certain telephone charges and visits to the Gold Club by managerial employees; and evidence concerning the termination of defendant Blount, a food and beverage manager employed by Richfield, allegedly based on sexual harassment of another employee or employees not involved in this suit. The trial court granted the motion in limine and excluded this evidence.
On appeal, plaintiffs argue that the actual reason for the termination of their employment was an attempt by Blount, Pearson, and/or Bennett, assistant food and beverage managers and general manager respectively, to bring more white females into the restaurant in the hopes of obtaining or furthering their romantic opportunities. Plaintiffs argue that the excluded evidence, including evidence concerning whether or not Blount was sexually harassing white, female bartenders at the hotel, and whether he was fired for such conduct, "were the crux" of the plaintiffs' case. Defendants counter, that this evidence even if somehow admissible, was not relevant to the issues in the case and that plaintiffs failed to explain or show how any such alleged sexual harassment by Blount could be probative of racial bias against the plaintiffs.
On review, we agree. As the trial court properly concluded, any evidence of the basis of Blount's termination for alleged misconduct not involving plaintiffs was irrelevant herein where the testimony undisputedly showed that Blount was neither involved in the investigation of plaintiffs' work-related activities, nor charged with the decision-making authority to terminate plaintiffs' employment. See Rios v. Rossotti, 252 F.3d 375, 379-380 (5th Cir. 2001) (citing Russell v. McKinney Hospital Venture, 235 F.3d 219, 227 (5th Cir. 2000)).
In Rios, the plaintiff asserting a claim of racial discrimination in the denial of a promotion, sought to avoid summary judgment in favor of her employer by relying on testimony as "[tending] to show that a general atmosphere hostile towards Hispanic employees existed at the IRS" and *184 that "specific comments had been made by IRS officials about Rios and her accent" to show the IRS's explanation was pretextual. Rios, 252 F.3d at 379. The appellate court affirmed the district court's conclusion that "the alleged negative comments ... made by individuals not connected to the selection process" was insufficient to raise or preserve a fact question for the jury as to the employer's alleged pretextual reason for denial of the promotion. Rios, 252 F.3d at 376. In so ruling, the Rios court noted that "[I]t is appropriate to tag the employer with an employee's [discriminatory] animus" provided "the evidence indicates that the worker possessed leverage, or exerted influence, over the titular decisionmaker." Rios, 252 F.3d at 380.
Moreover, even if evidence of Blount's alleged termination for sexual harassment could somehow be construed to show that Blount preferred to work with white women, such evidence would have no probative value with regard to the issue of Richfield's alleged racial discrimination and pretextual firing as alleged by plaintiffs. Accordingly, we find no abuse of the trial court's broad discretion in granting the defendants' motion in limine and excluding this evidence.

Evidentiary Ruling No. 2
Plaintiffs next contend that the trial court erred in allowing after-acquired evidence to be admitted on behalf of defendants in the form of expert accounting testimony by Bruce Bush. Bush, a certified public accountant employed by the accounting firm of Peat Marwick as director of the corporate transactions department, was accepted by the court as an expert in the field of accounting and auditing. Bush was retained by Richfield in October of 1994 to look into two areas of concern. The first area of concern involved irregularities of management and certain expense reports from the Sheraton Hotel. The second area of concern focused on the hotel's restaurant operations and high food costs.
In order to determine whether there were any irregularities in these two areas, Bush reviewed underlying accounting records and data for the time period of January of 1993 through March of 1994 (i.e., the period of seven months prior and subsequent to plaintiffs' terminations) to verify whether the records substantiated the termination of plaintiffs' employment as stated by defendants in their employment discharge records.
Bush also reviewed various forms of reimbursement involving hotel management. The first form of reimbursement consisted of petty-cash type disbursements where management would submit receipts and receive reimbursement from the petty-cash box. The second form of reimbursement involved management's submission of expense reports and receipts, and the receipt of reimbursement in the form of checks.
After conducting his investigation, Bush verified that cash intake had been significantly under-reported in the restaurant for the period of time preceding August of 1993. The estimated loss of revenue was approximately $5,000.00 to $6,000.00 per month, which totaled $40,000.00 to $44,000.00. Based on the receipts he reviewed, Bush was able to identify that the problem areas and verify that the problem of missing funds had occurred during the day shift. According to Bush, his documented findings supported defendants' reasons for terminating plaintiffs' employment for misconduct.
On appeal, plaintiffs argue that this testimony was improperly admitted, given that plaintiffs had stipulated that they would not seek reinstatement or front pay beyond the time Peat Marwick completed its analysis of Richfield's accounting records. *185 Plaintiffs argue that this evidence and testimony was irrelevant and was improperly admitted in violation of the "after-acquired evidence doctrine."
In McKennon v. Nashville Banner Publishing Company, 513 U.S. 352, 362-63, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the United States Supreme Court adopted the `after-acquired evidence doctrine' in cases arising under the Age Discrimination in Employment Act and similar employment statutes. Under the `after-acquired evidence doctrine,' the employer argues that it has acquired evidence since the time of the earlier wrongful `action that, had it known at the time, would have led it to do exactly what it did, except for a legitimate reason rather than an illegal one.'
Miller v. AT & T, 83 F.Supp.2d 700, 704 (S.D.W.Va.2000), (emphasis added) (footnote omitted), affirmed by, 250 F.3d 820 (4th Cir.2001), quoting, Russell v. Microdyne Corporation, 65 F.3d 1229, 1237 (4th Cir.1995).
Under McKennon, in order for an employer to invoke the after-acquired evidence defense successfully, i.e. to rely upon after-acquired evidence of wrongdoing to defeat or limit a claim should an unlawful discharge be found, the employer must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the allegedly improper discharge. McKennon, 513 U.S. at 363, 115 S.Ct. at 886-887; Russell, 65 F.3d at 1238. And, as plaintiffs correctly note, the defense may be used to limit the employee's collection of damages and back pay to the period from the date of the alleged unlawful discharge until the time of the discovery of the after-acquired evidence that would have resulted in his or her discharge had it been known at the time of the initial termination. McKennon, 513 U.S. at 362, 115 S.Ct. at 879. However, we reject plaintiffs' claim that the evidence at issue was improperly admitted or that the trial court improperly relied upon or violated the doctrine.
As noted by the Miller court, in the typical after-acquired evidence case, at the time of termination, the employer is not aware of the additional conduct by the employee that could have provided an independent reason to terminate the employee. Miller, 83 F.Supp.2d at 705; see also, e.g., McKennon, 513 U.S. at 354-355, 115 S.Ct. at 882-883 (after employee was wrongfully terminated, employer discovered evidence that employee had misappropriated several confidential financial documents of the employer); Russell, 65 F.3d at 1240 (after termination of employee, employer discovered that employee had made several misrepresentations in her resume and application for employment).
In the instant case, Bush's testimony was not admitted for the purpose of providing an additional basis to support the plaintiffs' termination or to provide, after the fact, an independent basis for the termination or to legitimize a prior wrongful termination. As the trial court properly recognized, this testimony was relevant to the issues of the case and the defenses raised by defendants. Through this testimony, defendants did not attempt to assert additional new grounds for plaintiffs' terminations; rather, based upon Bush's comprehensive review of the hotel and restaurant's accounting statements and financial information, this testimony was admissible to document in more complete detail the basis for the restaurant's revenue shortages and high food costs, and to substantiate the defendants' claim that a justified basis existed for terminating plaintiffs' *186 employment, and that the action taken by defendants was not racially based.
Thus, we find no error by the trial court in the admission of this evidence; nor do we find that Bush's expert testimony in the field of accounting and auditing was improperly admitted under the after-acquired evidence doctrine.

Evidentiary Ruling No. 3
Plaintiffs also complain that the trial court erred in allowing evidence of plaintiff Cleveland Wright's post-employment guilty plea to one count of felony theft to be submitted to the jury. Wright, testified that he was convicted of felony theft two years after he left his employment at the Sheraton Hotel and that he was also convicted of false swearing because he lied on a job application.
Plaintiffs argue that once the jury heard that Wright, who had served as the restaurant manager at the hotel, was an admitted thief, the jury was so prejudiced that it could not possibly have rendered a verdict in favor of the plaintiffs. Plaintiffs contend that evidence of Wright's subsequent conviction should have been excluded under LSA-C.E. art. 403,[5] as "its probative value was minimal, supposedly being only offered for impeachment purposes, and its prejudicial effect was incalculable."
At trial, the court allowed evidence of the names and dates of Wright's subsequent convictions for impeachment purposes, pursuant to LSA-C.E. art. 609 A(2), which provides as follows:
A. General civil rule. For the purpose of attacking the credibility of a witness in civil cases, no evidence of the details of the crime of which he was convicted is admissible. However, evidence of the name of the crime of which he was convicted and the date of conviction is admissible if the crime:
* * *
(2) Involved dishonesty or false statement, regardless of the punishment.
The defendants contend that plaintiffs waived their objection to this testimony, if one existed, when plaintiffs' counsel asked Wright on direct examination whether he had previously been convicted of felony theft. The defendants point out that inasmuch as plaintiffs elicited the very evidence that they now contend prejudiced their case, the plaintiffs waived any objection to the testimony and failed to preserve the issue for appeal. The defendants further argue that even if plaintiffs had preserved the issue for appeal, the admission of this testimony was proper and does not constitute reversible error, citing Combs v. Hartford Insurance Company, 544 So.2d 583, 585-586 (La.App. 1st Cir.1989), writ denied, 550 So.2d 630 (La. 1989).
In Combs, plaintiff filed a motion in limine seeking to exclude certain photographs, which motion was denied by the trial court. Plaintiff asked that his objection to the court's ruling be noted for purposes of appeal. Plaintiff's counsel then began questioning plaintiff about the photographs and sought to introduce them into evidence. On appeal, this court held that plaintiff was precluded from assigning error to the inclusion of his own evidence. Combs, 544 So.2d at 585. In so ruling, this court cited the per curiam opinion in Acosta v. Lea, 56 So.2d 201 (La.App. 1st Cir.1952), which held that an objection to certain testimony of a witness *187 was waived when the objecting party called the witness and proceeded to examine her on the subject matter of the objectionable testimony. See also, Hope v. Gordon, 186 La. 697, 173 So. 177 (1936) (which held that a party may, by his acts or omissions, waive or be estopped from making objections to the admission or exclusion of evidence; and that such waiver or estoppel may arise from failure to object, from acts done or omitted before the evidence is offered, as by failure to object to previous similar evidence, or from some affirmative act done after the ruling on the evidence).
Applying these precepts, and considering that plaintiffs elicited the very testimony they now argue was prejudicial to their case, we agree that plaintiffs are prohibited from assigning error to the admission of this evidence at trial. We also find that this assignment presents nothing for review. Moreover, even if we were to conclude the issue had been properly preserved for review, clearly the names and dates of Wright's subsequent convictions were admissible for impeachment purposes, pursuant to LSA-C.E. art. 609 A(2). Thus, we likewise find no error by the trial court in this evidentiary ruling.
This assignment of error lacks merit.

DIRECTED VERDICT

(Assignment of Error Number Three)
In this assignment, plaintiffs claim that the trial court erred as a matter of law in granting the defendants' motion for a directed verdict and dismissing plaintiffs' defamation claims against the Richfield defendants.
Louisiana Code of Civil Procedure article 1810, which governs directed verdicts, provides as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. McNeely v. Ford Motor Company, Inc., 98-2139 (La. App. 1st Cir.12/28/99), 763 So.2d 659, 664, writ denied, XXXX-XXXX (La.4/28/00), 760 So.2d 1182. A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Pratt v. Himel Marine, Inc., XXXX-XXXX, p. 17 (La.App. 1st Cir.6/21/02), 823 So.2d 394, 406, writs denied, 2002-2025, 2002-2128 (La.11/1/02), 828 So.2d 571, 572.
However, if there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. Pratt, XXXX-XXXX at pp. 17-18, 823 So.2d at 406. Furthermore, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims. Legal sufficiency of the evidence challenges, such as those presented by motions for directed verdicts, are *188 reviewed on appeal de novo. Hall v. Folger Coffee Company, XXXX-XXXX, p. 10 (La.4/14/04), 874 So.2d 90, 99.
The following elements are essential to prevail on a claim of defamation: (1) defamatory words; (2) publication; (3) falsity; (4) actual or implied malice; and (5) resulting injury. Davis v. Benton, XXXX-XXXX, p. 9 (La.App. 1st Cir.2/23/04), 874 So.2d 185, 190. One who makes an otherwise defamatory statement enjoys a conditional privilege upon establishing that he made the statement in good faith, on a matter in which he had an interest or a duty, and to another person with a corresponding interest or duty. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 15 (La.7/5/94), 639 So.2d 730, 743. A statement is made in good faith when it is made with reasonable grounds for believing it to be true. Ruffin v. Wal-Mart Stores, Inc., XXXX-XXXX, p. 3 (La.App. 1st Cir.5/10/02), 818 So.2d 965, 967-968, writ denied, XXXX-XXXX (La.9/30/02), 825 So.2d 1200. The jurisprudence establishes that communications between an employer and the Department of Employment Security generally enjoy a qualified privilege. Ruffin, XXXX-XXXX at p. 3, 818 So.2d at 968.[6]
Plaintiffs argue that certain statements made by defendant, Eloise Moore, a consultant with Gibbens Company who represented Richfield at plaintiff Annie Mae Anderson's unemployment compensation hearing, were clearly defamatory. According to plaintiffs, "in connection with her contractual duties to Richfield, Moore made the defamatory statement that the plaintiffs were testifying pursuant to instructions given to them by their attorney." Plaintiffs argue that these statements were tantamount to accusations of criminal acts and were defamatory by implication.
Plaintiffs also contend that defendant Bennett was answerable in damages for defamation as he instructed Shannon Dick, his administrative assistant, to state on the LDOL form that plaintiffs were involved in large sums of money "coming up" missing or disappearing from their department. Plaintiffs argue that these statements "impute" plaintiffs' collective involvement in the crimes of theft and perjury, and are defamatory per se. Plaintiffs contend that the elements of malice and falsity thus are presumed and the burden shifted to defendants to rebut this presumption. In support of this proposition, plaintiffs cite Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958) and Clements v. Ryan, 382 So.2d 279 (La.App. 4th Cir.1980).[7]
While plaintiffs acknowledge that communications between an employer and the Department of Employment Security generally enjoy a qualified privilege, plaintiffs argue that the statements were not made in good faith, as the defendants did not have reasonable grounds for believing them to be true.
Regarding any defamatory statements allegedly made by Moore at Anderson's *189 unemployment compensation hearing, defendants maintain that plaintiffs failed to introduce the unemployment hearing transcripts into evidence for the jury to consider. Thus, any statements allegedly made by Moore were never heard by the jury. Defendants further note that although plaintiffs' counsel purported to read from a portion of the unemployment hearing transcript during an introduction to a question, statements of counsel made during trial are not considered evidence. Thus, defendants contend, plaintiffs could not rely on any statements that may have been made by Moore at the unemployment hearing as a basis for defeating the motion for a directed verdict by establishing the elements of their defamation claim because they were not properly introduced into evidence before the jury.
Defendants further submit that plaintiffs' reliance on the LDOL forms was also flawed. The forms state that large sums of money "came up missing" and that an investigation had indicated that claimant was "involved." Defendants argue that the statements contained on the LDOL forms are not defamatory in that defendants did not accuse all of the plaintiffs of theft by these statements, but simply and accurately stated the hotel's good faith belief that an investigation indicated Anderson's involvement with missing revenue.
Finally, defendants contend that plaintiffs submitted no evidence of any damages sustained by them as a result of the statements they contend were defamatory. In support, defendants point to plaintiffs' concession that irrespective of any statements in the Anderson hearing or notations on the LDOL form, plaintiffs ultimately received unemployment benefits. Defendants contend that while Johnson testified that "it didn't feel good" to be accused of theft, such testimony is patently insufficient to establish their claim for damages resulting from alleged claim for damages defendants argue given the deficient evidence set forth by plaintiffs, the trial court was well within its discretion in finding that reasonable men could not reach a contrary verdict and in granting a directed verdict dismissing the defamation claims.
As further support, defendants note that plaintiffs were unable to make the required showing at trial of malice or bad faith on the part of the defendants and argue that the comments were made by individuals who had a conditional privilege in making the statements which were made in good faith and upon reasonable grounds for believing them to be true. Pearson testified that he had no first-hand knowledge of theft on the part of any of the plaintiffs; nor did he ever have any intention of opposing plaintiffs' unemployment benefits. Thus, defendants argue, plaintiffs failed to show that he was engaged in any conspiracy to deprive them of benefits. He stated that the first time he had any knowledge that plaintiffs were being accused of theft was when he was appeared at the unemployment hearings. Moreover, Bennett, who was responsible for the wording on the LDOL forms, testified that he felt he had reasonable grounds to terminate plaintiffs' employment based upon the results of the investigation that had been conducted concerning the missing revenue.
In granting the defendant's motion for directed verdict and dismissing their defamation and conspiracy claims, the trial court stated as follows:
As to a cause of action for defamation, you have to have defamatory words, you have to have publication, they have to be false, they have to be done with malice and it has to be resulting  some resulting injury. In this regard, the only evidence that we've heard of defamation *190 has been at the  comments made at the unemployment hearing which in the Court's opinion have a certain amount ofthat some of those things or what's done at an unemployment compensation hearing, just as many of the things that are done in a courtroom in a trial, havethere's some privilege that attaches to that. Not only do these people have a right to seek unemployment compensation, but the employer has a right to oppose it. The defamatory words being the statements that they had committed theft, that there were large sums of money missing, in fact, if they were false, could be defamatory. In the Court's opinion, they weren't published outside the confines of the privileged hearing. The Court didn't hear anything about what kind of injury. The Court's not convinced that it was done with malice. The Court will grant the Motion for Directed Verdict on the issue of defamation.
Considering the evidence submitted and the substantive law underpinning the plaintiffs' defamation claims, we likewise find no evidence of malice or bad faith with regard to the allegedly defamatory statements to the LDOL, which we also agree were subject to a qualified privilege. The evidence set forth by plaintiffs at trial failed to show that statements made by Pearson and Bennett were not made in good faith and that Pearson and Bennett did not have reasonable grounds for believing them to be true. Thus, the defendants' statements and actions were subject to a qualified privilege. Additionally, the alleged statements made by Moore were not introduced into evidence before the jury and as such, are not before this court for review. Further, on this record, we find that reasonable men could not reach a contrary verdict. See McNeely, 763 So.2d at 664. Accordingly, the trial court correctly granted the defendants' motion for directed verdict with regard to these claims.
This assignment also lacks merit.

MOTION FOR NEW TRIAL  DISCRETIONARY GROUNDS

(Assignment of Error Number Four)
At the outset we note that although an interlocutory judgment, such as a denial of a motion for new trial, is not generally appealable, it is subject to review by an appellate court when an appealable judgment is rendered in the same case. Bailey v. Robert V. Neuhoff Limited Partnership, 95-0616, pp. 3-4 (La.App. 1st Cir.11/9/95), 665 So.2d 16, 18, writ denied, 95-2962 (La.2/9/96), 667 So.2d 534. See also Carpenter v. Hannan, XXXX-XXXX, p. 4 (La.App. 1st Cir.3/28/02), 818 So.2d 226, 228, writ denied, XXXX-XXXX (La.10/25/02), 827 So.2d 1153.
Plaintiffs contend in this assignment that they are entitled to a new trial pursuant to LSA-C.C.P. art. 1973, in order to allow the jury to hear evidence that was crucial to plaintiffs' case based upon the arguments set forth above by plaintiffs in assignments of error numbers two and three (challenging evidentiary rulings and the directed verdict).
In deciding a motion for new trial, the trial judge is free to evaluate the evidence without favoring either party; he may draw his own inferences and conclusions and may evaluate credibility of the witnesses to determine if the jury has erred in giving too much credence to an unreliable witness. Busby v. St. Paul Insurance Company, 95-2128 (La.App. 1st Cir.5/10/96), 673 So.2d 320, 332, writ denied, 96-1519 (La.9/20/96), 679 So.2d 443.
*191 The trial court has much discretion in determining whether to grant a motion for new trial. LSA-C.C.P. art. 1971. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545 (La.App. 1st Cir.3/11/94), 634 So.2d 466, 493, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094. However, the denial of a motion for new trial should not be reversed on appeal unless there has been an abuse of discretion. Belle Pass Terminal, Inc., 634 So.2d at 493.
Louisiana Code of Civil Procedure article 1973 provides that a new trial may be granted in any case if there is good ground therefore, except as otherwise provided by law. Because, we find no merit to plaintiffs' arguments in assignments of error numbers two and three, we likewise find no abuse of the trial court's broad discretion in denying their motion for new trial pursuant to LSA-C.C.P. art. 1973 premised upon those arguments.

MOTION FOR NEW TRIAL PEREMPTORY GROUNDS

(Assignment of Error Number One)
In this remaining assignment, plaintiffs contend that the jury verdict rendered in this matter was clearly contrary to the law and evidence, and that plaintiffs are thus entitled to a new trial pursuant to LSA-C.C.P. art. 1972(1).
Louisiana Code of Civil Procedure article 1972(1) provides that a new trial shall be granted when the verdict or judgment appears clearly contrary to the law and the evidence. Although the granting or denial of a motion for new trial rests within the wide discretion of the trial court, the discretion of the court is subject to some limitations. The fact that a determination on a motion for new trial involves judicial discretion does not imply that the trial court can freely interfere with any verdict with which it disagrees. Davis v. Wal-Mart Stores, Inc., XXXX-XXXX, p. 10 (La.11/28/00), 774 So.2d 84, 93 (citing Gibson v. Bossier City General Hospital, 594 So.2d 1332, 1336 (La.App. 2nd Cir.1991)). The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Davis, XXXX-XXXX at p. 10, 774 So.2d at 93. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. Davis, XXXX-XXXX at p. 10, 774 So.2d at 93. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Davis, XXXX-XXXX at p. 10, 774 So.2d at 93.[8]
Accordingly, we must consider whether the jury's verdict is supportable by any fair interpretation of the evidence. Plaintiffs asserted claims against defendants under Louisiana's intentional discrimination in employment law, LSA-R.S. 23:1006, which was in effect at the time of the filing of plaintiffs' petition. In their amended petition, plaintiffs also set forth allegations of violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. Sections 1981, 1985(c), and/or 1988. Overall, plaintiffs *192 alleged that the defendants discriminated against them and other African-American employees with respect to "terms, wages, conditions, privileges, advantages, and benefits of employment" with the defendants, citing several practices and policies implemented by defendants. Plaintiffs ultimately alleged that the "true reason" for their discharge from their employment at the Baton Rouge Sheraton was racially motivated/based in violation of LSA-R.S. 23:1006. At the conclusion of the trial below, however, the jury completed the verdict form by answering "No" when asked if they found that "the articulated, legitimate reason for the firing of plaintiffs was a pretext, and that race was a motivating factor for the firing of the plaintiffs," thus finding in favor of defendants.
Because LSA-R.S. 23:1006 is similar in scope to the federal prohibition against discrimination, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., Louisiana courts have looked to federal jurisprudence to interpret Louisiana discrimination laws. King v. Phelps Dunbar, L.L.P., 98-1805, p. 7 (La.6/4/99), 743 So.2d 181, 187. Thus, we may consider federal jurisprudence to analyze plaintiffs' state and federal claims.
The burden of proving that the defendants intentionally discriminated against the plaintiffs because of race rests solely with the plaintiffs. The employer/defendant does not have any burden of proving it did not discriminate. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253, 101 S.Ct. 1089, 1093-1094, 67 L.Ed.2d 207 (1981). Therefore, the scheme of proof under federal jurisprudence requires that the plaintiffs first establish by a preponderance of the evidence a prima facie case of racial discrimination. Seagrave v. Dean, 2003-2272, p. 6 (La.App.1st Cir.6/10/05), 908 So.2d 41, 45. When the discrimination claim is based on circumstantial evidence, as is usually the case, the well-established burden-shifting analysis provided in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802-804, 93 S.Ct. 1817, 1824-1825, 36 L.Ed.2d 668 (1973), applies. A plaintiff is first required to establish a prima facie case by showing that he: (1) is a member of a protected class; (2) was qualified for the position; (3) was terminated; and (4) was replaced by someone outside the protected class. Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 587 (5th Cir.1998), rehearing en banc granted, 169 F.3d 215 (5th Cir.), opinion reinstated in pertinent part, 182 F.3d 333 (5th Cir.1999).
Once established, the plaintiff's prima facie case raises an inference of intentional discrimination and the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant comes forward with a reason, which, if believed, would support a finding that the challenged action was nondiscriminatory, the inference raised by the plaintiff's prima facie case drops from the case. LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 (5th Cir.1996). The plaintiff then has the full and fair opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that race was. McDonnell Douglas, 411 U.S. at 804-805, 93 S.Ct. at 1825-1826.
After a case has been fully tried on the merits, the McDonnell Douglas burden-shifting analysis ceases to be of import to an appellate court. Instead, our inquiry becomes whether the record contains sufficient evidence to support the conclusions reached by the jury. Deffenbaugh-Williams, 156 F.3d at 587. When there is conflict in the testimony, reasonable inferences of fact and reasonable evaluations of *193 credibility should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
In the instant case, in support of plaintiffs' argument on appeal that the jury's verdict herein is clearly contrary to the law and evidence, plaintiffs contend that they were treated disparately, compared to the treatment received by defendants, Blount and Bennett, who allegedly also committed violations of company policies and procedures.
Defendants refute plaintiffs' charge of disparate treatment citing the testimony of Bonnie Stanley, who was the front office manager at the Sheraton. Stanley testified that she had knowledge of white employees whose employment at the Sheraton was terminated without warning for mishandling tickets in the food and beverage department, as well as a white employee in the accounting department who was terminated for suspicions of theft without warning. Defendants further claim that plaintiffs' racial discrimination theory cannot be reconciled with the fact that: (1) defendants' investigation of plaintiffs' activities was based upon the suspicions and concerns voiced by Jimmy Jackson, the head chef, and Wendell Carrier, the head of security, both of whom are African American; and (2) defendants hired three African Americans to replace plaintiffs after their discharge.
To establish a claim of disparate treatment, plaintiffs must show that defendants gave preferential treatment to employees outside the protected class under "nearly identical" circumstances. Little v. Republic Refining Company Limited, 924 F.2d 93, 97 (5th Cir.1991). The circumstances of plaintiffs and defendants, Blount and Bennett, do not meet this test. Instead, comparison of these respective employees' circumstances to plaintiffs' circumstances shows that Bennett and Blount were employed in different positions at the Sheraton, had different supervisors, and were engaged in different conduct resulting in disciplinary action.
Plaintiffs additionally argue that the "real motivation" for their firings was the desire of Blount, Bennett, and Pearson to bring more young, white females into the hotel restaurant "in the hopes of obtaining companionship or more" with the replacements. We find no merit to plaintiffs' unsupported allegations that their discharge was motivated by Blount's motivation to seek white female companionship at the hotel. Moreover, Blount was not involved in the investigation, nor did he have the authority to terminate plaintiffs from their employment, as previously discussed in the first evidentiary assignment of error. See Rios, 252 F.3d at 379-380.
Lastly, plaintiffs' point to the statistical testimony of Dr. Lynn Lamotte, contending that the statistical analysis set forth by Lamotte is "strong evidence" of discrimination and proves that the "proffered reasons" given by defendants for plaintiffs' terminations was pretextual. Plaintiffs conclude that the overwhelming weight of the evidence submitted to the jury shows that a discriminatory animus existed.
Plaintiffs' expert, Dr. Lynn Roy Lamotte, who was accepted as an expert in the field of statistics and statistical analysis, testified that he performed a statistical *194 analysis study based on the facts of this case. He was provided with the basic assumption that eight persons had been fired and was given two scenarios. The first was that the eight were replaced with eight white employees and second, that the eight were replaced by seven white employees and one non-white employee. Considering the relevant labor market, which he defined as the food service group, he computed the statistical odds of the replacement scenarios set forth above occurring. He computed this analysis in two geographical areas. One was restricted to East Baton Rouge Parish and the other was composed of a broader four-parish area he defined as a metropolitan statistical area, which included East Baton Rouge Parish, West Baton Rouge Parish, Ascension Parish, and Livingston Parish.
Dr. Lamotte opined that in the four-parish metropolitan statistical area, the odds of conducting a job search as would replace eight African Americans employees, given the relevant labor force composition, with at least seven white employees, was one in fifty-two. Applying the same model to East Baton Rouge Parish resulted in odds of one in one hundred forty six. Lamotte further concluded that in the four-parish metropolitan statistical area, the odds that a job search to replace eight African Americans employees, given the relevant labor force composition, with eight white employees, was one in five hundred forty-seven. Applying the same model to East Baton Rouge Parish resulted in odds of one in two thousand.
Defendants, however, cite the testimony of Dr. William J. Moore, who was accepted by the trial court as an expert in the field of labor economics and labor market discrimination. Dr. Moore pointed out several flaws in Dr. Lamotte's findings. Dr. Moore did not believe that Dr. Lamotte's assumptions provided a valid basis for the analysis. Moore testified that Lamotte used a sample of eight people throughout his analysis, and drawing statistical inferences about probability based on that one sample of eight, which represents the 53% minority workers in East Baton Rouge Parish. Dr. Moore pointed out that the problem with the approach taken by Dr. Lamotte was that his approach assumes that the sample Lamotte was working from would always, in every group, look like the population group (i.e., if 53% of the workers in the labor market in East Baton Rouge Parish are minorities, Lamotte was assuming implicitly that every sample of eight people that show up at the Sheraton would have the same racial composition as East Baton Rouge Parish for that type of worker). Dr. Moore testified that there is no reason to believe that to be true. Moore explained that when drawing a small sample, inferences cannot be made about the population. He stated that, in his opinion, the loss of probability that Lamotte applied did not apply to small single samples. Moore suggested that if Lamotte had drawn ten samples of eight and then taken the average from each of those samples, he could have applied the laws of probability.
Dr. Moore also testified that Dr. Lamotte failed to consider the Sheraton's actual work force, which consisted of 62.9% minorities at the time. Instead, Lamotte made his calculations using a small sample of people who were hired at that particular time. According to Dr. Moore, in 1993, a work force of hotel service workers employing 62.9% minorities was equal to or higher than minority population of the entire parish or metropolitan area. In 1993, the Baton Rouge Sheraton employed 26.7% minority officials and managers, or almost double the statistical norm for that area, which was a higher than expected number of minority managers. Dr. Moore concluded that if the Baton Rouge Sheraton *195 were discriminating, the data indicated that they were discriminating in favor of minorities rather than against them. Finally, Dr. Moore testified that he did not believe that Dr. Lamotte's conclusions were based on an accurate method of measuring whether or not discrimination was occurring.
We find defendants articulated a legitimate, nondiscriminatory reason for their discharge. The evidence overwhelmingly establishes that Richfield had legitimate, non-discriminatory grounds for the decision to discharge plaintiffs based on management's good faith belief that plaintiffs had acted in concert to systematically deprive the hotel of certain restaurant revenues, resulting in exorbitant food costs for a period of at least a year.
In support of defendants' claim that the reason for discharge was not racially based, they offered the testimony of Bruce Bush, their accounting and auditing expert, who upon review of all pertinent records, determined that the food costs in the hotel were high because the revenue was being understated or not reported for a period preceding August of 1993, which was identifiably traceable, based upon the receipts and paperwork, to the day shift staffed by plaintiffs. In making this determination, Bush and his staff reviewed and analyzed documents, including cash summaries, for a period of seven months before and after August of 1993. Bush testified that the average guest ticket was $8.00 to $8.25. The average dollar loss per day was $200.00 to $220.00, which represented approximately 20 to 30 guest tickets per day. He calculated that the restaurant suffered an overall loss of $5,000.00 to $6,000.00 per month totaling $40,000.00 to $44,000.00.
Although Bush could not determine which employee was responsible for the missing tickets, he determined that given the number of tickets per day, more than one person in that particular shift had been involved. Citing later restaurant records, Bush calculated a 10% drop in food costs after the plaintiffs were terminated. Moreover, before plaintiffs were terminated, cash sales in the restaurant were only at 20% to 30% of the restaurant's business. After plaintiffs were terminated, the volume of cash sales increased drastically averaging from 40% to 50%. Bush ruled out that the revenue loss could have been caused by food spoilage or by food "going out the backdoor" explaining that these circumstances would not have affected the relationship in terms of cash sales.
Additionally, defendants presented the testimony of Jimmy Jackson, Executive Chef at the Sheraton; Wendell Carrier, Director of Security at the Sheraton; Peter Pearson, Food and Beverage Director of the Sheraton; Roger Bennett, General Manager of the Sheraton; Bonnie Stanley, Front Office Manager at the Sheraton; and the testimony of Rebecca Bellue, David Gruenwald, Barry Crawford, and David Smith, all undercover officers employed by the East Baton Rouge Parish Sheriff's Department, to show the restaurant's financial situation and the circumstances surrounding internal investigation of the missing revenue.
The investigation was prompted by Executive Chef Jimmy Jackson, who was in charge of controlling food costs in the restaurant. Jackson testified that prior to the investigation being launched, the daily hotel revenue reports did not reflect that he received credit for all of the food that he had prepared. His complaints and questions prompted the hotel to investigate the possibility that money was being taken for food sales. The investigation ultimately revealed that the loss in revenue was attributable to "missing checks" that were either never entered into the *196 computer, or were entered into the computer and then never "closed out." The theory confirmed by defendants' investigation was that a wait staff person would give a customer a ticket (generally for the lunch buffet, which was the most popular lunch order) and then, rather than entering the ticket number and amount in the computer, the employee would pocket the cash. Jackson cited occasions where a missing ticket for a meal for twenty people was later found at Wright's home and another instance when he found a ticket "lying around" the restaurant. Jackson testified that after plaintiffs were terminated, the food costs in the restaurant came down to where they should have been. He further testified that after the plaintiffs were terminated, the number of "covers" starting actually reflecting the number of people eating in the restaurant.
Plaintiffs argue that the hotel's investigation revealed no direct evidence of stealing by any of the plaintiffs, and note that Wendell Carrier, the hotel security director in charge of the investigation failed to keep any written documentation of the investigation. Plaintiffs argue that the absence of such evidence shows the jury's findings and verdict are unsupported. We disagree. Given the overwhelming testimony and evidence offered herein, the jury was presented with ample evidence to support the verdict without the need for written notes by Carrier.
After hearing the entirety of the testimony adduced herein over the course of nine days and weighing the evidence set forth by the parties during the trial of this matter, the jury obviously gave greater weight to the defendants' witnesses. After a thorough review of the voluminous testimony and evidence submitted herein, we find the evidence was overwhelmingly sufficient and supports the conclusions reached by the jury. See Deffenbaugh-Williams, 156 F.3d at 587. Accordingly, we find the jury's verdict is clearly supported by a fair interpretation of the evidence and thus decline to set it aside. See Davis, XXXX-XXXX at p. 10, 774 So.2d at 93.
This assignment also lacks merit.

CONCLUSION
For the above and foregoing reasons, the December 30, 2002 judgment of the trial court is affirmed. Costs of this appeal are assessed against the plaintiffs/appellants, Cleveland J. Wright, Annie Mae Anderson, Daisy Mae Pursley, Yvonne Johnson, Linda Denise Harris, Letha Wheeler, Lawanda Hall, and Kimberly Armstead.
AFFIRMED.
NOTES
[1] Louisiana Revised Statute 23:1006 was subsequently repealed by Acts 1997, No. 1409 § 4, effective August 1, 1997.
[2] Plaintiffs' claims against defendants, Gibbens Company, Inc. and Eloise Moore, were separately dismissed by summary judgment, granted by the trial court on February 22, 1995. Thus, these defendants are not involved in the instant appeal.
[3] According to plaintiffs' amended petition, Aetna Life Insurance Company owned the Sheraton Hotel and had entered into a contract with Richfield Hotel Management, Inc. to provide management services for the Sheraton.
[4] Plaintiffs do not challenge the award of or the amount of attorney's fees.
[5] Louisiana Code of Evidence article 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
[6] See generally, Kelly v. West Cash & Carry Building Materials Store, 99-0102 (La.App. 4th Cir.10/20/99), 745 So.2d 743; Melder v. Sears, Roebuck and Co., 98-0939 (La.App. 4th Cir.3/31/99), 731 So.2d 991; and Heflin v. Sabine Association of Retarded Citizens, 96-782 (La.App. 3rd Cir.12/26/96), 685 So.2d 665.
[7] We note, however, that in Schaefer v. Lynch, 406 So.2d 185 (La.1981), the Louisiana Supreme Court overruled its decision in Madison. In Schaefer, the Court found that while Madison correctly held that truthful statements that carry a defamatory implication can be actionable, a public official cannot recover damages because a defamatory publication is motivated by illwill unless the publication is also false. Schaefer, 406 So.2d at 188.
[8] See also Martin v. Heritage Manor South, XXXX-XXXX, pp. 14-15 (La.App. 1st Cir.4/3/01), 784 So.2d 627, 637; Engolia v. Allain, 625 So.2d 723, 729 (La.App. 1st Cir. 1993); and Temple v. State Department of Transportation and Development, XXXX-XXXX, p. 14 (La.App. 1st Cir.6/27/03), 858 So.2d 569, 580, writ denied, 2003-2116 (La.11/7/03), 857 So.2d 501.